**DESTEC ENERGY, INC.; Destec Holdings, Inc.; McKittrick Limited; McKittrick Power Associates, L.P., Plaintiffs,**

v.

**SOUTHERN CALIFORNIA GAS COMPANY, Defendant.**

**No. CIV. A. H–95–1639.**

United States District Court, S.D. Texas, Houston Division.

June 6, 1997.

Opinion Denying Reconsideration Feb. 2, 1998.

David J Beck, Beck Redden and Secrest, Houston, TX, for Destec Energy Inc, Destec Holdings Inc, McKittrick Limited, McKittrick Power Associates L P, CC Cogen Inc, Galloway Power Corporation, McKittrick Power Generation I Inc, Chalf Cliff Limited, Chalk Cliff Cogen Inc, Dominion Cogen CA Inc.

David T Harvin, Vinson & Elkins, Houston, TX, for Southern California Gas Co.

Mark Fogelman, San Francisco, CA, for Public Utilities Com.

Sylvia M Goodrich, Liddell Sapp Zivley et al, Houston, TX, for Tannehill Electric Company Inc.

### MEMORANDUM, OPINION, AND ORDER

ROSENTHAL, District Judge.

In this antitrust case, plaintiffs, who own and operate cogeneration facilities in Kern County, California, challenge the inclusion of transport-or-pay clauses in two long-term natural gas transportation contracts with the defendant utility company. The California Public Utility Commission approved both contracts in 1988; the contracts expire in the year 2012. Plaintiffs assert that by refusing to enter into contracts without transport-or-pay clauses, defendant monopolized or attempted to monopolize the natural gas transportation market in Kern County, California. Defendant has moved for summary judg-

ment,[1] asserting that as a matter of law, the state action doctrine, the filed rate doctrine, and the *Noerr–Pennington*[2] doctrine preclude plaintiffs' antitrust claims.

This court has carefully considered the pleadings, the motions, the parties' submissions, the arguments of counsel, and the applicable law. Based on this review, this court GRANTS defendant's motion for summary judgment, for the reasons stated below.

## I. Background

Defendant Southern California Gas Company ("SoCalGas") is a California corporation providing natural gas and gas transportation services in parts of central and southern California. SoCalGas is subject to regulation by the California Public Utilities Commission ("CPUC"). As a regulated utility, SoCalGas is required to provide service to all customers within its service area and can do so only on the basis of tariffs or, as in this case, contracts, approved by the CPUC.

In the mid–1980s, SoCalGas was the only natural gas supply and transportation company in western Kern County, California, where plaintiffs McKittrick Limited ("McKittrick") and Chalk Cliff Limited ("Chalk Cliff") were each developing enhanced oil recovery cogeneration facilities. Plaintiffs Destec Energy, Inc., Destec Holdings, Inc., McKittrick Power Associates, L.P., CC Co-Gen, Inc., Galloway Power Corporation, McKittrick Power Generation I, Inc., Chalk Cliff Limited, Chalk Cliff Cogen, Inc., and Dominion Cogen CA, Inc., were, and are, direct and indirect owners and operators of cogeneration facilities in Kern County, California.[3] (Docket Entry No. 1, ¶ 3).

In 1985, Kern River Gas Transmission Company ("Kern River"), a company based in Houston, Texas, and Mojave Pipeline Company ("Mojave Pipeline"), a company based in El Paso, Texas, sought certification from the Federal Energy Regulation Commission ("FERC") to build pipelines to transport natural gas into the Kern County, California market to serve the enhanced oil recovery ("EOR") steam generation and cogeneration markets.[4]

In the mid–1980s, while seeking investors' commitments to their proposed cogeneration facilities, plaintiffs McKittrick and Chalk Cliff began negotiating natural gas pipeline transportation contracts with SoCalGas. Plaintiffs sought long-term agreements without "transport-or-pay" provisions. Such provisions require shippers or purchasers to pay for the transportation of certain quantities of gas, regardless of whether that amount of gas is actually transported. In return, the transporter agrees to commit a certain pipeline capacity to that customer. Plaintiffs allege that SoCalGas, knowing that plaintiffs needed gas transportation service on competitive terms and could not endure delays because of their need to obtain financing for the proposed cogeneration plants, refused to agree to contract without transport-or-pay provisions. (Docket Entry No. 1, p. 10).

It is undisputed that on July 26, 1988, plaintiffs and SoCalGas entered into two fifteen-year transportation contracts containing transport-or-pay provisions. (Docket Entry No. 7, Exhibit A, Attachments 1 and 2, Art. 2). It is also undisputed that on September 14, 1988, following contested proceedings, the CPUC issued Resolutions G–2821 and G–2822, approving each contract and specifically noting the presence of the transport-or-pay

---

1. Defendant initially filed a motion to dismiss. This court informed the parties that the motion would be considered as one for summary judgment. (Docket Entry No. 36).

2. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–37, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961).

3. Destec Energy, Inc. is the parent corporation of Destec Holdings, Inc. Destec Holdings, Inc. is the parent of McKittrick and Chalk Cliff. McKittrick Power Associates, L.P., is the general partner of McKittrick. Galloway Power Corporation

and McKittrick Power Generation I Inc. are general partners of McKittrick Power Associates. CC CoGen, Inc. is a limited partner of McKittrick. Chalk Cliff Cogen Inc. and Dominion Cogen CA, Inc. are general partners of Chalk Cliff.

4. Enhanced oil recovery ("EOR") is a method of recovering oil by using natural gas to produce steam which is injected into the ground to heat the oil so that it may be produced more efficiently, 22 CPUC 2d 444, 480; Docket Entry No. 6, Exhibit 4, p. 480.

requirements. (Docket Entry No. 6, Exhibits 7 and 8). Plaintiffs allege that they were "compelled to accept SoCalGas's contracts," with the transport-or-pay provisions, because they were unable to finance the construction of the cogeneration projects without long-term transportation contracts.

Plaintiffs allege that in August 1989, SoCalGas further enlarged and entrenched its monopoly by settling litigation with Kern River and Mojave Pipeline over their efforts to obtain FERC certification for interstate pipeline service into Kern County. Under the settlement, SoCalGas agreed to stop resisting Kern River's and Mojave Pipeline's efforts to obtain FERC certification. In exchange, Kern River and Mojave Pipeline agreed to provide SoCalGas options to buy the California portions of their pipelines in the year 2012. That date coincides with the expiration of the long-term contracts between plaintiffs and SoCalGas. Plaintiffs allege that if SoCalGas exercises these options in 2012, SoCalGas will once again have an exclusive monopoly over the natural gas transportation market in Kern County, California.

In 1992, Kern River and Mojave Pipeline had received FERC certification, completed construction, and begun interstate commercial gas transportation service in Kern County, California. Plaintiffs allege that they could not use the competitive advantages of such service because the "transport-or-pay" provision in the SoCalGas contracts made it economically infeasible for them to do so. SoCalGas notes that plaintiffs could have obtained gas transportation services from SoCalGas at higher tariffs or rates, without transport-or-pay clauses, rather than negotiating individual long-term contracts with transport-or-pay clauses. By entering the long-term contracts, the plaintiffs obtained cheaper rates in the years before the competitors' service became available. (Docket Entry No. 5, p. 4 and No. 38, p. 8).

On May 26, 1995, plaintiffs filed this suit, alleging that SoCalGas monopolized and attempted to monopolize and/or restrain trade in the market for the transportation of natural gas to the cogeneration facilities owned by McKittrick and Chalk Cliff, by refusing to negotiate long-term contracts without transport-or-pay provisions. Plaintiffs also allege that SoCalGas's challenge to FERC certification of the competitors' proposed pipelines and SoCalGas's acquisition of options to purchase the competitors' California pipeline operations were further attempts to monopolize the natural gas transportation markets in Kern County, California. Plaintiffs allege violations of the Sherman Act, 15 U.S.C. § 2, and the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COM. CODE ANN. § 15.05 (West 1987). Plaintiffs seek a declaratory judgment that the transport-or-pay provisions of their contracts with SoCalGas are void and unenforceable, damages for violations of the antitrust laws, and an injunction against further antitrust violations.

SoCalGas argues that the state action doctrine and the filed rate doctrine preclude plaintiffs' antitrust claims based on the transport-or-pay provisions; that ripeness issues, a lack of antitrust injury, and the state action doctrine preclude plaintiffs' claims based on the options to purchase the California portions of the Texas-based pipelines; and that the *Noerr–Pennington* doctrine precludes plaintiffs' claims based on SoCalGas's opposition to Kern River's and Mojave Pipeline's FERC certification application. (Docket Entry No. 5).

SoCalGas filed suit against plaintiffs in California state court, asserting breach of contract for plaintiffs' refusal to pay amounts due under the transportation contracts. Plaintiffs asserted antitrust challenges as affirmative defenses to that suit. The state court dismissed those defenses; the breach of contract suit is proceeding in that forum.

On February 23, 1996, plaintiffs moved for discovery in this case under Rule 56(f). (Docket Entry No. 39). Following a hearing, this court granted that motion in part, allowing plaintiffs to depose Stanley Hulett and Donald Vial, CPUC commissioners during the relevant time period, and Frederick John, former senior vice president of SoCalGas's parent company and vice-president of regulatory affairs for SoCalGas. (Docket Entry No. 53). The summary judgment record includes excerpts from those depositions.

The summary judgment record also includes the following:

- copies of the two contracts at issue (Docket Entry No. 60, Exhibits 15 and 17);

- the relevant California statutes, CPUC regulations, and CPUC agency decisions (Docket Entry Nos. 6, 42, 57, and 60);

- the affidavit of John Van Noord, an employee of another CPUC regulated utility, Pacific Gas & Electric Co. (Docket Entry No. 15, Exhibit 1, Tab A);

- the affidavit of Donald Asher, an employee of the predecessor of Destec Energy, Inc. (*id.*, Tab B);

- the affidavit of Stanley Hulett, a former CPUC commissioner (*id.*, Tab C);

- the affidavit of John R. Scalp, rate design manager for SoCalGas (Docket Entry No. 42, Exhibit D);

- the affidavit of Albert Boyce, president of Tannehill Electric Co., Inc., another SoCalGas customer (Docket Entry No. 60, Vol. 1, Exhibit 3);

- the affidavit of Robert B. Weisenmiller, a technical consultant on energy markets and regulations (*id.*, Vol. 2, Exhibit 8);

- the affidavit of Catherine M. Elder, an expert in natural gas markets and regulation (*id.*, Exhibit 9);

- a memorandum written by Dan Douglass, an attorney at SoCalGas (Docket Entry No. 60, Vol. 2, Exhibit 6);

- a letter written by Frederick John to the CPUC (*id.*, Vol. 3, Exhibits 19 and 20);

- a memorandum written by Joan LeSage, an in-house attorney for SoCalGas (*id.*, Exhibit 21); and

- a letter from Albert Boyce to Stanley Hulett (Docket Entry No. 65, Exhibit 3).

The parties have filed a number of excellent briefs, and the CPUC has filed an *amicus* brief. These briefs present the arguments on each of the dispositive issues, which the court analyzes below.

## II. The California Statutes, Regulations, and CPUC Decisions

The California legislature established the CPUC to regulate the rates, services, and facilities of California's public utilities. CAL. CONST. art. XII; CAL. PUB. UTIL. CODE §§ 454-55 (West 1994 Supp.). The CPUC supervises the rate charged by natural gas utilities, including SoCalGas. *Id.* In the exercise of these supervisory powers, the CPUC is responsible for assuring that the gas utilities' rates are "just and reasonable" and not "unlawful, unjust, unreasonable, discriminatory, or preferential." *Id.* §§ 451, 728, 729.

No utility may charge a rate unless it is approved by the CPUC. *Id.* § 454(a). Generally, a utility must charge rates set out in the tariff schedule applicable to all utilities. *Id.* § 532. However, the CPUC may establish exceptions to this rule. *Id.* A utility may charge rates different from established tariffs or rates only after the utility has sought and obtained CPUC approval. *Id.* § 454(a). A utility wishing to change the rates charged must give notice of its application for change to all customers affected by the proposed change. *Id.* § 454. Rates cannot be changed until and unless the CPUC has determined that the new rate is justified. *Id.* §§ 454(a), 455.

Public hearings are held to determine the reasonableness of proposed rates. *Id.* § 311. Administrative law judges accept evidence on behalf of the CPUC and prepare and file opinions setting out recommendations, findings, and conclusions with the CPUC. *Id.* The administrative law judges' recommendations are "proposed decisions," which are placed into the public record. *Id.* Ratepayers and the public are represented at rate proceedings before the CPUC by the statutorily created Division of Ratepayer Advocates. *See, e.g., Id.* §§ 309.5, 321, 321.5, 454.

The CPUC may inspect the utilities' accounts, books, papers, and documents, and may independently audit the utilities. *Id.* §§ 314(a), 314.5, 2100-15. The CPUC may examine under oath any officer, agent, or employee of a public utility in relation to its business and affairs. *Id.* § 314(a). If a CPUC regulated utility charges a tariff not

approved by the CPUC, the CPUC may require the utility to collect the undercharge and may fine gas utilities for allowing that undercharge. Id. § 2100. The CPUC's decisions are published in full within a year after issuance. Id. § 323.

In 1978, the United States Congress passed the Natural Gas Policy Act, 15 U.S.C. §§ 3301–3432, which changed federal policy toward the natural gas market and moved toward deregulation. In 1984 and 1985, FERC issued a series of rulings, including FERC Order Number 380 in May 1984, and subsequent proposed and final rules, which instituted new transportation procedures for natural gas pipelines. Beginning in 1985, the CPUC issued rulings to take account of these changes in the natural gas market. The CPUC specifically addressed the changes that would allow interstate pipelines to use a blanket transportation certificate and therefore expand the interstate transportation market.

On December 20, 1985, the CPUC issued an interim decision, D. 85–12–102, 20 CPUC 2d 6 (1985),[5] for the stated purpose of allowing intrastate utilities to meet the competition from the proposed new interstate pipelines and to meet the needs of the EOR market. In this decision, the CPUC recognized the unique status of the EOR market. Id. at 20. The CPUC also affirmed its commitment to having the Kern County, California EOR market served by California gas distribution utilities, rather than by interstate pipelines. Id.

In the December 1985 decision, the CPUC emphasized that the EOR market required "special consideration." Because EOR customers were served on schedules that allowed for monthly variations in their rates, the CPUC stated that conventional tariffs and the margin derived from them "cannot presently be considered a reasonable proxy for the transportation rate which would be required to provide service to the entire EOR market, which is the goal of both this Commission and the California distribution companies." Id.

The December 1985 CPUC decision allowed utilities to negotiate individual long-term transportation contracts with EOR customers rather than using set tariffs. This approach was to "provide utilities with the negotiating flexibility required to meet the needs of their EOR customers and to meet the competition of the interstate pipeline proposals." Id. The CPUC set a specific rate treatment for all gas transported to EOR facilities, including cogeneration facilities, and required that all negotiated contracts be filed with the CPUC Evaluation and Compliance Division, which would be responsible for assuring that all the contracts were consistent with the incentive rate mechanism provided. The CPUC stated that the purpose of its treatment of EOR customers was to "secure for California ratepayers the substantial benefits of having California distribution companies serve this important new market." Id. at 21.

The CPUC specifically required the use of take-or-pay provisions in long-term transportation contracts in Decision No. 85–12–102. That decision stated in relevant part as follows:

> We strongly concur with the provision [of SoCalGas's proposal] that makes the customer liable for payment of not less than 50% of the transport fees for the volumes agreed to be delivered on an annual basis. This will provide the utility with a measure of certainty that the transportation customer will indeed remain a transportation customer for the list of the contract, and will not in an unpredictable fashion abandon transportation and seek to return as a sales customer, or leave the system altogether. This certainty seems important for orderly utility planning of its gas acquisition needs.

(Docket Entry No. 6, Exhibit 5, p. 26). The CPUC made a finding of fact that "[a] 50% take-or-pay provision is a reasonable condition to all long-term transportation agreements in order to encourage transportation customers to transport their own gas for the entire life of their contract." (Id., p. 33, Finding of Fact No. 54).

---

5. Docket Entry No. 6, Exhibit 5.

On December 3, 1986, the CPUC issued Decision Nos. 86–12–009 and 86–12–010 ("Decisions 9 and 10") (22 CPUC 2d 444 and 22 CPUC 2d 491, 1986 WL 215056) (Docket Entry No. 57, Exhibits 5 and 2). These decisions followed the CPUC's Order Instituting Rulemaking ("OIR") 86–06–006 and Order Instituting Investigation ("OII") 86–06–005. In Decisions 9 and 10, the CPUC "unbundled" the traditional combination service provided by utilities, separating the "merchant function," which was recognized as more competitive in nature, from the "transmission function," with its natural monopoly characteristics and economies of scale. D. 86–12–009, 22 CPUC 2d at 450. The CPUC divided gas customers into core—those which must receive bundled gas service from the utilities—and noncore—those which will be allowed to pick and choose from among a variety of transmission and procurement services.

The CPUC described the relationship between Decisions 9 and 10 as follows:

[T]ogether [they] set forth final policies to restructure natural gas regulation in the State of California.

In [Decision 10] we adopt rules establishing the general regulatory and industry structures, taking into consideration comments filed by parties in response to a set of proposed rules.... Today's companion decision [9] addresses the allocation of costs and design of gas transmission and procurement rates in light of the broader policies adopted in this decision.

D. 86–12–010, 22 CPUC 2d at 501. The CPUC outlined the background of the companion decisions, stating:

[I]n December 1985, we ordered the regulated California gas utilities to offer long term gas transportation services to customers which wished to purchase nonutility gas supplies [Decision 85–12–102]....
Both long and short-term rates were ordered based on an "equivalent margin recovery" approach.... As an exception enhanced oil recovery customers were allowed to negotiate lower transportation rates.

In the meantime, we were laying the foundations for the present move toward cost-based rates.... [T]he two proceedings from which orders emanate today were initiated on June 5, 1986. Order Instituting Investigation 86–06–005 proposed cost allocation and rate design policies based on long run marginal costs. Evidentiary hearings have been held ... and the issues are resolved in the companion decision [9] issued today.

This OIR [86–06–006], issued at the same time, contained a set of proposed policies regarding the overall industry structure and regulatory approach contemplated.

*Id.* at 502–03.

In Decision 10, under the heading "Intrastate Transmission," the CPUC made the following statements relating to take-or-pay clauses:

[The] arguments are more persuasive that there are no cost differences between long term and short term transmission service sufficient to justify a 50 percent take-or-pay requirement for the long term service without a comparable charge for short term service. We also agree ... that the intent of a take-or-pay requirement can be met equally well by the demand charge which is contemplated as a separate charge applied to all transmission customers. Elimination of the take-or-pay requirement is consistent with our goal to generally simplify the overall program.

We conclude that there should be a continuum of contract lengths available to customers. Although the issue of transmission rates is more fully discussed in our companion decision [9], we note that customers will be allowed to negotiate any combination of contract length and firmness of service, and that the rate for such service will be determined through contract negotiations.

*Id.* at 508.[6] The CPUC included Finding of Fact No. 5 and Conclusions of Law Nos. 7 and 8, as follows:

5. There are no cost differences between long-term and short-term transmission

---

**6.** Decision 10 refers to "I.86–06–005." D. 86–12–010, 22 CPUC 2d at 508. I.86–06–005 is the investigation which led to Decision 9. *See* D. 86–12–010, 22 CPUC2d at 501.

service sufficient to justify a 50 percent take-or-pay requirement for only long term service.

\* \* \* \* \* \*

7. There should not be take-or-pay requirements for long-term transmission service at this time.

\* \* \* \* \* \*

8. There should be a continuum of transmission contract lengths available to non-core customers, with appropriate terms and conditions established through contract negotiations.

*Id.* at 564.[7]

In Decision 9, the CPUC detailed specific rules for EOR customers. The CPUC reaffirmed its findings in Decision 85–12–102 that the existing intrastate utilities were sufficient to serve the EOR market:

> [W]e continue to believe that it is in the best interest of all California gas ratepayers that such Kern County EOR gas demand as may exist be served by the California utilities. . . . [T]he bypass of existing utility systems by the certification, construction, and use of an interstate pipeline will have a potentially significant adverse impact on the rates of existing ratepayers, who will have to bear a greater proportion of the utilities' fixed costs by reason of the utilities' loss of existing load and their potential failure to attract new load.

*Id.* at 480–81. The CPUC summarized its conclusions as to the EOR market:

> [T]his Commission has consistently held the view that it is in the best interest of all California ratepayers that the California gas distribution utilities serve the EOR market in Kern County and, indeed, throughout California. To achieve this end, and pursuant to our obligation to ensure that the utilities' rates and services are "just and reasonable" under sections 701, 728, 729, 761, and 762 of the Public Utilities Code, we reaffirm our view that the utilities should seek to serve as much of the EOR market as possible under the

terms and conditions set forth in this decision. Service to the EOR market is a key element of our announced policy to serve natural gas customers in the most economically efficient manner and to prevent the possibility that unstructured competition in the gas markets will unfairly disadvantage certain gas customers. . . . [T]he Commission reaffirms its previous policy which permits the utilities to negotiate individual long-term service contracts with EOR customers and to bring these contracts to the Commission for approval. . . . We fully expect and encourage the utilities to enter into long-term contracts for service to the EOR market in order to meet the EOR customers' needs.

*Id.* at 481–82.

In Decision 9, the CPUC stated that, when fully implemented, the new rate structure would replace the incentive rate payment structure established by 85–12–102. *Id.* at 482. The CPUC then stated its unwillingness to set limits beyond "floor and ceiling price limits" on the utilities' ability to negotiate individual contracts with EOR customers:

> [I]t should be clear to all parties that we have authorized our utilities to enter into long-term contracts at fixed or otherwise clearly specified transmission rates. Such long-term contracts were first contemplated in D. 85–12–102 . . . . While today's decision supersedes D. 85–12–102, we continue to believe that it is important to provide the utilities with the ability to enter into long-term contracts at predictable rates with EOR customers. Beyond the floor and ceiling price limits, we are establishing today, we do not intend to limit the utilities' ability to negotiate appropriate contract terms and conditions, including contract length, with EOR customers. . . .
>
> The EOR producers have asserted that long-term transportation contracts having terms of 5, 10, 15, or even 20 years may be necessary to satisfy their service needs. We authorize the utilities to negotiate contracts having such terms, if so desired.

---

7. In 1990, the CPUC reinstituted its 1985 requirement that long-term contracts include take-or-pay charges. *See In re Gas Utility Procurement Practices and Refinements to the Regulatory* *Framework for Gas Utilities,* D. 90–09–089, 37 CPUC 2d 583, slip op. at 25 (Cal.P.U.C. Sept. 25, 1990) (replacing the demand charge with transport-or-pay charges, then called "use-or-pay").

We caution the utilities, however, that such long-term contracts engender uncertainties for both the utilities' ratepayers and their shareholders. Accordingly, prudent. management might well dictate securing a pricing premium commensurate with the added risks engendered by long-term commitments.... We are requiring that all noncore contracts having terms of 5 years or more be submitted by advice letter for our approval after a 20–day comment period. We view this requirement of contract approval as an essential element of our responsibility actively to supervise the provision of transportation service not only to EOR producers but to all noncore customers.

*Id.* at 483.

It is undisputed that SoCalGas submitted the two contracts at issue for CPUC approval. After a notice and comment period, the CPUC approved both contracts. In CPUC Resolutions G–2821 and G–2822, issued on September 14, 1988, the CPUC expressly recognized that the contracts contained transport-or-pay provisions. The Resolution approving the McKittrick contract included the following provision:

Minimum Transmission Obligation: There is no fixed demand charge, however, McKittrick is required to transport and/or to purchase from SoCal not less than 50% of its annualized contract quantity. If this quantity is not transported or purchased by McKittrick, McKittrick will pay the transmission costs for this minimum quantity. Make-up is allowed in the two-year period following the under delivery, however, the right to make-up only extends for one year after contract termination.

(Docket Entry No. 6, Exhibit 7). The Resolution approving the Chalk River contract contained the same provision. (*Id.*, Exhibit 8).

In the discussion of the transport-or-pay provisions, the CPUC Resolutions contained the following statement:

D. 85–12–102 also stated that "should a negotiated rate ever become less than the floor described above (3 cents per therm at the time), shareholders will be at risk for making up the deficiency." Finding 54 (at p. 46) states: "A 50% take-or-pay provision is a reasonable condition to all long-term agreements in order to encourage transportation customers to transport their own gas for the entire life of their contract." (*Id.*, Exhibit 7).

These statutes and agency decisions and resolutions frame the issue presented here.

## III. The Elements of the State Action Doctrine

█] The Fifth Circuit has summarized the background of the state action doctrine, as follows:

In the seminal case of *Parker v. Brown,* the Supreme Court, addressing whether a state marketing program violated the [Sherman Anti–Trust] Act, held that "in a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." Therefore, "in view of the [Act's] words and history, it must be taken to be a prohibition of individual and not state action."

Thus, from *Parker* originated the "state action doctrine," which confers antitrust immunity for state regulatory programs. The Court subsequently made clear in *[California Retail Liquor Dealers Assn v.] Midcal [Aluminum, Inc.]* that private party conduct pursuant to a regulatory program shares this immunity only if the conduct meets both prongs of a two-prong test, henceforth called the *"Midcal* test." This test requires that: (1) the challenged restraint be clearly articulated and affirmatively expressed as state policy; and (2) the state actively supervise any anticompetitive conduct.

*DFW Metro Line v. Southwestern Bell,* 988 F.2d 601, 604 (5th Cir.1993) (citing *Parker v. Brown,* 317 U.S. 341, 352–53, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.* 445 U.S. 97, 104–06, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)). There is a close relationship between the two prongs of the

*Midcal* test. "Both are directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 635–37, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992) (*Ticor II*), *on remand*, 998 F.2d 1129 (3d Cir.1993) (*Ticor III*), *cert. denied*, 510 U.S. 1190, 114 S.Ct. 1292, 127 L.Ed.2d 646 (1994).

■ The cases decided since *Parker*[8] clarify that state action immunity is in the nature of an affirmative defense; the party claiming immunity has the burden of proof. *Ticor II*, 112 S.Ct. at 2172; *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 37–39, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24 (1985); *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 731–33, 93 S.Ct. 1773, 1778, 36 L.Ed.2d 620 (1973); *Yeager's Fuel v. Pennsylvania Power & Light*, 22 F.3d 1260, 1267 (3d Cir.1994); *Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d 429, 434 (9th Cir.1992). Under these cases, SoCalGas bears the burden of demonstrating that there are no disputed fact issues material to resolving the application of the state action doctrine and that, as a matter of law, the transport-or-pay clauses in the two contracts were allowed by a clearly articulated and affirmatively expressed state policy and were the result of active supervision by the state.

## A. The First Prong: A Clearly Articulated and Affirmatively Expressed State Policy

The first prong of the *Midcal* test requires that the state have a "clearly articulated and affirmatively expressed" policy in favor of the challenged restraint. Plaintiffs argue that in 1988, the State of California no longer followed a policy of displacing competition with regulation in the field of natural gas transportation. (Docket Entry No. 14, pp. 16, 19; Docket Entry No. 71, pp. 3–4). Plaintiffs also argue that in Decision 10, the CPUC prohibited take-or-pay clauses, or, alterna-

tively, that Decisions 9 and 10 create a fact issue as to whether the inclusion of transport-or-pay clauses in the contracts violated the CPUC policy then in effect. (Docket Entry No. 59, pp. 22–26).

SoCalGas contends that in 1988, the State of California and the CPUC had a policy of regulation displacing competition in the intrastate gas transportation market. (Docket Entry No. 70, p. 32). SoCalGas asserts that Decision 10, which precludes the use of take-or-pay clauses, did not apply to individually negotiated long-term transmission contracts for EOR customers, but rather that such contracts were specifically addressed in Decision 9, which contained no prohibition against take-or-pay clauses. SoCalGas asserts that there is no disputed fact issue and that the first prong of the *Midcal* test is met as a matter of law.

In *Midcal*, the Supreme Court stated that "the *challenged restraint* must be 'one clearly articulated and affirmatively expressed as state policy.'" 100 S.Ct. at 943 (emphasis added). This language suggests that the challenged restraint—the inclusion of transport-or-pay provisions in long-term EOR gas transportation contracts with negotiated utilities—must have been clearly articulated and affirmatively expressed as the policy of the State of California. *See, e.g., Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 942 (9th Cir.1996)("the relevant question is whether the regulatory structure which has been adopted by the state has specifically authorized the conduct alleged to violate the Sherman Act").

In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), decided before *Midcal*, the Supreme Court required the state policy favoring regulation to be specifically addressed to the challenged restraint. In *Cantor*, the State of Michigan regulated electric utility rates. The utility company had a policy of providing residential customers new light bulbs at no additional

8. In *Parker*, the Supreme Court treated the issue of state action immunity as one of preemption. 63 S.Ct. at 314. The Supreme Court and appellate court cases cited have clarified that state action immunity is an affirmative defense. *See, e.g., Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 103 F.3d 1446, 1455 (9th Cir.1996), *amended and superseded on rehearing*, 111 F.3d 1427 (9th Cir.1996); *Yeager's Fuel*, 22 F.3d at 1266; *Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558, 1563 (10th Cir.1991), *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).

cost. The state public utility commission approved of this practice and mandated that it could not be changed until the tariff was changed. A retail druggist, who sold light bulbs, sued, claiming that the utility was using its monopoly power in violation of the Sherman Act. The Supreme Court held that Michigan did not have an affirmatively expressed policy that the utility company provide light bulbs at no charge. The Supreme Court found that the state policy was to regulate rates, not to provide for light bulb exchanges. *Id.* at 3119.

Since deciding *Midcal,* the Supreme Court has moved away from such a narrow construction of the state policy requirement. In *Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the government challenged the collective ratemaking activities of rate bureaus composed of common carriers operating in four states. The rate bureaus submitted rate proposals to the Public Service Commission in each state. The Supreme Court considered whether a state statute authorizing a state commission to regulate common carriers sufficiently evidenced an intent to authorize collective ratemaking. The Supreme Court stated that:

[a] private party acting pursuant to an anticompetitive regulatory program need not "point to a specific, detailed legislative authorization" for its challenged conduct. *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. at 415, 98 S.Ct. 1123 (opinion of Brennan, J.). As long as the State as sovereign clearly intends to displace competition in a *particular field* with a regulatory structure, the first prong of the *Midcal* test is satisfied.... Therefore, we hold that if the State's intent to establish an anticompetitive regulatory program is clear, as it is in Mississippi, the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of the federal antitrust laws.

*Id.* at 1730–31 (emphasis added). The Supreme Court explained that:

If more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies. Agencies are created because they are able to deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness. *Cf. Hallie v. Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (requiring explicit legislative authorization of anticompetitive activity would impose "detrimental side effects upon municipalities' local autonomy").

*Id.* The Supreme Court concluded that where a "State's intent to establish an anticompetitive regulatory program is clear, ... the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of the federal antitrust laws." *Id.* at 1731.

In *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), a state statute authorized municipalities to regulate zoning. The plaintiff advertising company challenged municipal regulations limiting where and how many billboards could be posted in the city, asserting that the regulations discriminated in favor of companies who already had billboards in place. *Id.* at 1348. The Supreme Court held that because the "very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition," the regulations met the first prong of the *Midcal* test. *Id.* at 1350. The Court reasoned that to require a specific state authorization of the challenged conduct would require federal courts continuously to review state action, explaining that:

"[i]f the antitrust court demands unqualified 'authority' in this sense, it inevitably becomes the standard reviewer not only of federal agency activity but also of state and local activity whenever it is alleged that the governmental body, though possessing the power to engage in the challenged conduct, has actually exercised its power in a manner not authorized by state law. We should not lightly assume that *Lafayette's* authorization requirement dic-

tates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for 'authority' in the full administrative law sense." P. Areeda & H. Hovenkamp, ANTITRUST LAW 212.3b, p. 145 (Supp. 1989).

We agree with that assessment, and believe that in order to prevent *Parker* from undermining the very interests of federalism it is designed to protect, it is necessary to adopt a concept of authority broader than what is applied to determine the legality of the municipality's action under state law.

*Id.* at 1349–50.

In *Federal Trade Comm'n v. Ticor Title Ins. Co.*, the Supreme Court restated the two-part *Midcal* test and held that

while a State may not confer antitrust immunity on private persons by fiat, it may displace competition with active state supervision if the displacement is both intended by the State and implemented in its specific details.

504 U.S. 621, 633, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992). The Supreme Court explained that

[b]oth [prongs of the *Midcal* test] are directed at ensuring that *particular anticompetitive mechanisms* operate because of a deliberate and intended state policy. In the usual case, *Midcal*'s requirement that the State articulate a clear policy shows little more than that the State has not acted through inadvertence; it cannot alone ensure, as required by our precedents, that particular anticompetitive conduct has been approved by the State.

*Id.* at 2178 (emphasis added) (internal citations omitted).

The threshold questions are whether the State of California deliberately displaced competition with regulation and whether the challenged restraint was a part of the field which the State clearly intended to regulate or was a foreseeable consequence of such regulation. In *Cantor*, although the state's regulatory scheme authorized rate-setting, product-tying was not a foreseeable consequence of such regulation and was not part of the field of rate-setting. In *Southern Motor Carriers*, the state regulated rates; the collective rate-making was a foreseeable consequence of such regulation and part of the field of rate-setting. In *City of Columbia*, the state authorized municipal zoning; regulation of the number and location of billboards was a foreseeable consequence of such regulation and part of the field of zoning.

Lower courts applying the Supreme Court cases have precluded challenges to anticompetitive practices that are the foreseeable results of state authorized regulation or within the field in which regulation has displaced competition. In *Cost Management Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937 (9th Cir.1996) the plaintiff challenged a private utility company's anticompetitive practices, including off-tariff pricing and tying products and services. The district court had held that the first prong of the *Midcal* test was satisfied because the state had clearly intended "to displace competition in [the market for sale of natural gas] with a regulatory structure." *Cost Management Servs.*, 99 F.3d at 942. The Ninth Circuit reversed, holding that the district court had "misapplied the first prong of the *Midcal* test." *Id.* The Ninth Circuit stated:

the Supreme Court clarified in *Ticor Title* that [the first prong of the *Midcal* test] is satisfied if a plaintiff establishes that 'the State has articulated a clear and affirmative policy to allow the anticompetitive conduct.' Accordingly, the fact that Washington may have displaced competition in the market for sale of natural gas with a regulatory structure is not dispositive. Rather, the relevant question is whether the regulatory structure which has been adopted by the state has specifically authorized the conduct alleged to violate the Sherman Act.

*Id.* Although this language suggests a requirement that the state expressly authorize the challenged restraint in its legislative mandate, the *Cost Management Servs.* holding is consistent with the Supreme Court's holdings in *Southern Motor Carriers* and

*City of Columbia.* In *Cost Management Servs.*, the court determined that the state's grant of authority to the public utility commission to set utility rates did not include a grant of authority to allow off-tariff pricing and product tying restraints. This result is consistent with the Supreme Court cases requiring that the challenged restraint be a foreseeable result of the statutory authorization [9] or part of the "particular field" in which competition has been replaced with a regulatory structure.[10] The Ninth Circuit held that off-tariff pricing and product-tying was not a foreseeable result of rate-setting and are not within the field of rate-setting.[11]

In *DFW Metro Line v. Southwestern Bell,* the plaintiff challenged the defendant phone company's decision to charge the plaintiff a higher rate for use of the defendant company's phone lines. The State of Texas had established the Texas Public Utility Commission to regulate the rates of Texas utility companies. The Fifth Circuit held that the state's clear intent to regulate the rates charged by Texas utilities satisfied the first prong of the *Midcal* test, explaining that:

> [w]e have previously held in *Metro I* that Bell meets the first prong of the *Midcal* Test. As neither *Ticor* nor any other Supreme Court decision or subsequent legislation has changed the legal foundation of that holding, we are bound by the law of the case doctrine to follow our finding in *Metro I* that the Texas system [which established a regulatory system in place of competition] satisfies the first *Midcal* prong.

*DFW Metro Line,* 988 F.2d at 605.

The Fifth Circuit's recent discussion of the *Midcal* test in *Martin v. Memorial Hosp. At*

*Gulfport,* 86 F.3d 1391 (5th Cir.1996) is consistent. In *Martin,* a doctor challenged a city hospital's practice of entering exclusive contacts with particular doctors for specific medical services. The Fifth Circuit held that to meet the first prong of the *Midcal* test, the hospital would have to show "a statutory scheme that demonstrates that the state legislature clearly contemplated the challenged anticompetitive conduct or that suppression of the competition was a foreseeable result of what the state authorized." *Martin,* 86 F.3d at 1399. The court explained that:

> [i]t is not necessary for the state legislature to have compelled or explicitly permitted the hospital to enter exclusive contracts having anticompetitive effects; it is enough if such suppression of competition was the "foreseeable result" of what the state authorized.

*Id.* Because the state had authorized municipal hospitals to enter into exclusive contracts with a single individual to "operate any aspect, division or department of its operations," the court concluded that the hospital's practice of entering into exclusive contracts with a doctor for a particular medical service "could have been reasonably anticipated by the [state legislature]." *Id.* at 1400.

Under the first prong of the *Midcal* test, courts begin the analysis by looking to what the state legislature has authorized. *See, e.g., Ticor Title Ins.,* 112 S.Ct. at 2174 (looking to the state statutes authorizing insurance companies to establish joint rates for its members); *City of Columbia,* 111 S.Ct. at 1348 (looking to the South Carolina statutes under which the city had enacted limits on

---

9. *City of Columbia,* 111 S.Ct. at 1350.

10. *Southern Motor Carriers,* 105 S.Ct. at 1730.

11. *See also Yeager's Fuel v. Pennsylvania Power & Light,* 22 F.3d at 1270 (holding that where the use of rebates and incentives by regional companies was a foreseeable consequence of the state's regulatory policy of promoting load management and energy conservation, the defendant had satisfied the first prong of the *Midcal* test, even though the state had not specifically approved of these practices); *F.T.C. v. Hospital Bd. of Directors of Lee County,* 38 F.3d 1184, 1192 (11th Cir.1994) (holding that a county hospital board's purchase of a private hospital was immune from

antitrust attack under the state action doctrine because the purchase was a foreseeable consequence of the state's policy of allowing the county to purchase medical facilities); *Unity Ventures v. Lake County,* 841 F.2d 770, 778 (7th Cir.), *cert. denied,* 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988) (where the state authorized counties and municipalities to contract together and combine resources for the provision of sewage treatment services, an agreement between a county and a village, giving the village control over access to sewer connections in its "sphere of influence," was a foreseeable consequence of the state action and immune from antitrust challenge).

billboards); *Town of Hallie,* 105 S.Ct. at 1718 (looking to the Wisconsin statutes that authorized a city to regulate waste removal services); *Southern Motor Carriers,* 105 S.Ct. at 1730 (looking to the Mississippi statutory authorization given to the state public service commission); *Midcal Aluminum,* 100 S.Ct. at 940 (looking to the California statutes regulating wine producers); *Columbia Steel Casting,* 111 F.3d at 1436 (looking to the Oregon statutory authorization given to the state's public utility commission); *Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.,* 760 F.2d 607, 610 (5th Cir.1985), *cert. denied sub nom., Arrow Northwest Inc. v. Greater Houston Transp. Co.,* 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985) (looking to the statute which granted municipalities regulatory power over the taxicab industry); *cf. Bates v. State Bar of Ariz.,* 433 U.S. 350, 357–61, 97 S.Ct. 2691, 2696–97, 53 L.Ed.2d 810 (looking to the disciplinary rules adopted by the Arizona Supreme Court); *Hefner v. Alexander,* 779 F.2d 277, 281 (5th Cir.1985) (looking to the disciplinary rules adopted by the Texas Supreme Court).

This court therefore begins the analysis of the first prong of the *Midcal* test by examining the California legislation creating the CPUC regulatory structure. The court then examines the CPUC regulations and decisions.

### 1. A Policy of Displacing Competition by Regulation

The courts have consistently recognized that the California legislation creating the CPUC regulatory structure constitutes a policy of displacing competition with regulation in natural gas transportation. *See, e.g., Nugget Hydroelectric, L.P.,* 981 F.2d at 435; *City of Vernon v. Southern Cal. Gas Co.,* 92 F.3d 1191, 1996 WL 138554, at *2 (9th Cir.1996); *Transphase Sys., Inc. v. Southern Cal. Edison Co.,* 839 F.Supp. 711, 715–16 (C.D.Cal. 1993); *Norcen Energy Resource v. Pacific Gas & Elec. Co.,* 1994 WL 519461, at *9 (N.D.Cal.1994). In 1988, California had a policy of displacing competition by regulation in the intrastate market for natural gas.

CAL. PUB. UTIL. CODE §§ 454–55. (West 1994 Supp.).

Plaintiffs contend that the federal attempts to deregulate the interstate natural gas market that began in the mid–1980s, and the CPUC's responses, establish that the State of California was changing its policy from regulation of the natural gas market to competition. A similar argument was rejected in *County of Stanislaus v. Pacific Gas & Elec. Co.,* 1994 WL 706711, at *24 (E.D.Cal.1994). In *County of Stanislaus,* the plaintiffs argued that "the CPUC's current policy of encouraging competition indicates no intent to displace competition with regulation." 1994 WL 706711, at * 24. The court disagreed. The court reasoned that the "[i]ntroduction of competition into a regulatory structure does not preclude application of immunity [under the state action doctrine]." *Id.* Relying on *Southern Motor Carriers,* the court concluded that the state had clearly intended to displace competition by vesting the CPUC with authority to regulate natural gas utility rates. *Id.* at *26.

There is no evidence that the State of California abandoned its longstanding policy of displacing competition by regulation in the natural gas market in 1988. However, plaintiffs argue that the state action doctrine requires a showing that the regulatory agency established and authorized by the state had a policy of displacing competition with regulation. Plaintiffs contend that beginning in 1986, the CPUC was increasing the level of competition in the California natural gas market in order to compete with increasing interstate competition.

It is undisputed that while the CPUC was allowing the natural gas utility companies more flexibility to compete with interstate carriers, the CPUC did so as part of its policy of continuing to regulate the California natural gas transportation market. *See, e.g.,* D. 85–12–102, 20 CPUC 2d 6, 20 (1985) (Docket Entry No. 6, Exhibit 4, p. 20) (allowing the utilities to negotiate individual long term transportation contracts with EOR customers, rather than using tariffs, in order to "provide utilities with the negotiating flexibility required to meet the needs of their EOR customers and to meet the competition of the

interstate pipeline proposals"); D. 86–12–009, 22 CPUC 2d 444, 480 (1986) (Docket Entry No. 6, Exhibit 4, p. 480) ("we continue to believe that it is in the best interest of all California gas ratepayers that such Kern County EOR gas demand as may exist be served by the California utilities.... And we have specifically granted the utilities the flexibility to negotiate higher priority service for EOR customers through non-standard service contracts"; "[the CPUC's goal is for the California utilities to serve] as much of the EOR market as possible ... [because] unstructured competition in the gas markets will unfairly disadvantage certain gas customers").

The CPUC's policy of allowing increased competition by the state-regulated utilities was consistent with, and part of, its policy of regulating the California natural gas market. *County of Stanislaus*, 1994 WL 706711, at * 24.

### 2. The Challenged Restraint: Transport–or–Pay Provisions

■ The State of California's authorization of the CPUC evidences a clear "intent that intrastate rates would be determined by a regulatory agency, rather than the market ... [and therefore the] details of the inherently anticompetitive rate-setting process ... are left to the agency's discretion." *See Southern Motor Carriers*, 105 S.Ct. at 1730. Plaintiffs acknowledge that before 1986, the CPUC included transport-or-pay clauses in long-term gas transportation contracts. It is undisputed that the use of transport-or-pay provisions in contracts subject to CPUC regulation and approval were part of the field that the California legislature regulated. The California legislature could have foreseen the use of transport-or-pay provisions as part of natural gas transportation regulation. *Martin*, 86 F.3d at 1400.[12]

Plaintiffs contend that the CPUC had specifically forbidden the use of take-or-pay provisions in gas transportation contracts in De-

cision 10, issued on December 3, 1986. D. 86–12–010, 22 CPUC 2d at 507–08. SoCal-Gas contends that Decision 10 did not apply to individually negotiated, long-term EOR gas transportation contracts, which were governed by Decisions 9 and 102. This position is supported by the Decisions and by the Resolutions approving the contracts.

Decisions 9 and 10 were issued simultaneously. 22 CPUC 2d 444 and 22 CPUC 2d 491; Docket Entry No. 57, Exhibits 5 and 2. Decision 10 states that Decisions 9 and 10 were companion rulings, which "together [would] set forth the final policies to restructure natural gas regulation." 22 CPUC 2d at 501. Decision 10 established general rules, while Decision 9 detailed specific implementation for particular markets, including the EOR market. 86–12–010; 22 CPUC 2d at 501.

Decision 10 states that transport-or-pay provisions should be replaced by demand charges in standard contracts, without regard to whether the contracts were long or short term. Decision 10 also states that "there should be a continuum of contract lengths available to customers. Although the issue of transmission rates is more fully discussed in our companion decision [9], we note that *customers will be allowed to negotiate any combination of contract length and firmness of service, and that the rate for such service will be determined through contract negotiations*." 22 CPUC 2d at 508 (emphasis added). Decision 10 states that transport-or-pay provisions were unnecessary in standard rate contracts, which would use demand charges as substitutes, but that the specifics for particular markets, including the EOR market, were discussed in Decision 9.

Decision 9 specifically addresses the unique aspects of the EOR market. In order to enable California's regulated utilities to serve the EOR market in Kern County, the CPUC was giving the utilities "more flexibili-

---

12. The absence of an express mention of the transport-or-pay provisions in the state statute creating the CPUC statutory framework is not determinative. *See Martin v. Memorial Hosp. at Gulfport*, 86 F.3d at 1398 ("[i]f the city acts pursuant to a clearly articulated state statutory

scheme, it is irrelevant that the statutes make no express mention of anticompetitive conduct"). If the "suppression of competition is the 'foreseeable result' of what the state authorizes," the first prong of the *Midcal* test is satisfied. *City of Columbia*, 111 S.Ct. at 1350.

ty to compete with the interstate pipeline proposals." 22 CPUC 2d at 480.[13] To accommodate this policy of increased flexibility without surrendering its duty to "protect ratepayers from some of the risks inherent in long-term contracts that offer pricing certainty" and to ensure that the contracts are "consistent with all effective regulations and guidelines," the CPUC required that it approve every individually negotiated transportation contract that was longer than five years. D. 86–012–009, 22 CPUC 2d at 483.

In Decision 9, the CPUC stated that it was important "to provide the utilities with the ability to enter into long-term contracts at *predictable rates* with EOR customers. Beyond the floor and ceiling price limits we are establishing today, we *do not intend to limit the utilities' ability to negotiate* appropriate contract terms and conditions, including contract length, with EOR customers." *Id.* (emphasis added).

[▮▮▮▮] In determining the meaning of these decisions, it is helpful to refer to general rules of statutory construction. Courts should give statutes their plain and ordinary meaning. *United States v. Hall,* 110 F.3d 1155, 1161 (5th Cir.1997) (citing *Bailey v. United States,* 516 U.S. 137, 143–45, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995)). Statutes should be read as a whole, so that each section of the statute is given meaning. *Hightower v. Texas Hosp. Ass'n,* 65 F.3d 443, 448 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1543 (5th Cir.), *cert. denied,* 513 U.S.

871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). A specific statutory provision governs a general one. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–85, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992); *Kirby Corp. v. Pena,* 109 F.3d 258, 270 (5th Cir. 1997).

Decisions 9 and 10 make it clear that Decision 9 was the more specific regulation. Decision 9 clearly states that utilities were free to negotiate individual contracts for long-term EOR transportation service, with few limitations. The plain language of Decisions 9 and 10 is consistent with SoCalGas's position that Decision 10's preclusion of transport-or-pay provisions was not to apply to individually negotiated long-term EOR gas transportation contracts. 22 CPUC 2d at 481.

In the Resolutions approving the contracts at issue, the CPUC notes that the transport-or-pay provisions would function as a substitute for demand charges. Cal.P.U.C. Resolution No. 2821 at 3. This is consistent with the language of Decision 9. In Decision 9, the CPUC stated that demand charges would be included as one element of the transmission charge for "tariffed rate default customers." 22 CPUC 2d at 472–73. The CPUC also stated that utilities would "have the most rate flexibility" in determining transmission charges for "noncore contracting customers." *Id.* at 473.

In its *amicus* brief,[14] the CPUC states that "[t]he statements in Decision 86–12–010 …

---

**13.** Decision 9 states:

While estimates of lost utility revenue vary depending on projected EOR demand levels, projected EOR transportation rates, and the projected extent of industrial load loss, if any, potential rate impacts in the range of more than $100 million annually are likely and are large enough to be of deep concern to this Commission.

. . .

Over the past year, we have taken a number of actions designed to address these concerns. With respect to the EOR producers' concern for firmness of service, we have already endorsed the concept of allowing EOR customers to obtain more secure service by paying higher rates. And we have specifically granted the utilities the flexibility to negotiate higher priority service for EOR customers through nonstandard service contracts.

22 CPUC 2d at 481; Docket Entry No. 6, Exhibit 4, p. 481.

**14.** Plaintiffs oppose this court's consideration of the CPUC *amicus curiae* brief, asserting that it is a "one-sided assertion of facts." (Docket Entry No. 42, pp. 2–3). The CPUC's *amicus* brief is properly before this court. Plaintiff's objection is overruled. *See, e.g., Hook v. Morrison Milling Co.,* 38 F.3d 776, 786 n. 13 (5th Cir.1994) (noting that the court's decision comported with the outcome supported by the Department of Labor in its *amicus* brief); *First Gibraltar Bank, FSB v. Morales,* 19 F.3d 1032, 1052 (5th Cir.), *cert. denied,* 513 U.S. 876, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994) ("by asserting the position that its regulations have preempted Texas homestead law, both in the [agency] Letter and in the [agency] *amicus* brief filed in the instant cause, the agency has implicitly interpreted its governing statutes to authorize such preemption").

[were] not applicable to individually negotiated long-term contracts, which were authorized and governed by Decisions 85–12–102 and 86–12–009." (Docket Entry No. 38, p. 6).

Plaintiffs contend that the summary judgment record raises a fact issue as to whether CPUC policy in effect in 1988 permitted the use of transport-or-pay provisions in individually negotiated long-term EOR contracts. (Docket Entry No. 59, pp. 19–20). Plaintiffs submitted an affidavit from Stanley Hulett, who served as CPUC commissioner from May 1986 to January 1991 and CPUC president from January 1987 to December 1988, stating as follows:

> In July 1988, the CPUC was opposed to the use of transport-or-pay provisions in long-term contracts between the utilities and the EOR operators. This position was articulated, as well, in Decision 86–12–010, which was the Commission's major decision which led to the restructuring of the California natural gas industry. Having dealt with the impact of the [FERC] decisions regarding take-or-pay, the CPUC was determined to avoid the problems created by the required pass through of such obligations, as it related to EOR contracts.

(Docket Entry No. 39, Exhibit 1, ¶¶ 5–7).[15] Hulett subsequently withdrew this affidavit, stating that he had been mistaken because he had failed to separate contracts serving the EOR market from other types of contracts in his discussion of the transport-or-pay provisions. (Docket Entry No. 65, Exhibit 1, pp. 62–64). The court allowed plaintiffs to depose Hulett. Stanley Hulett testified in his deposition that Decision 10 did not apply to individually negotiated EOR contracts and the transport-or-pay provisions were necessary to maintain a minimum contribution because the EOR customers would receive a discounted rate through such contracts.

(Docket Entry No. 57, Exhibit 5, pp. 24, 551–53, 105–06).

Donald Vial, a former CPUC Commissioner, testified in his deposition that the contracts at issue were governed by Decision 9 and Decision 12 together; were special contracts, dealt with separately from standard tariff contracts; and the transport-or-pay provisions were necessary to maintain a minimum contribution because plaintiffs were receiving an otherwise discounted rate by individually negotiating the contracts. (Docket Entry No. 57, Exhibit 7, pp. 28–29, 35–36, 77–78).

[█] Plaintiffs' evidence of the recollections, seven years later, of subjective interpretations of CPUC policy by individual former CPUC officials, do not raise a fact issue as to whether the CPUC policy forbid the use of transport-or-pay provisions in individually negotiated EOR transportation contracts. "Immunity is conferred by the official actions of state government, not by the subjective intentions of state officials." *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 60 F.3d 1390, 1398 n. 8 (9th Cir. 1995). The Resolutions approving the contracts with the transport-or-pay provisions are the CPUC's official actions implementing its decisions. *Cf. INS v. Cardoza–Fonseca*, 480 U.S. 421, 446–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987); *Hamdan v. INS*, 98 F.3d 183, 184 (5th Cir.1996); *Consarc Corp. v. United States*, 71 F.3d 909, 915 (D.C.Cir. 1995). The CPUC's official actions show that Decision 10 did not apply to individually negotiated long-term EOR contracts. Cal. P.U.C. Resolution No. 2821, p. 7; Cal.P.U.C. Resolution No. 2822, p. 7; Docket Entry No. 38.

The CPUC's approval of transport-or-pay provisions in the individually negotiated long-term EOR contracts is not clearly inconsistent with Decisions 9 and 10. While Decision

---

**15.** Plaintiffs also submitted the affidavit of Donald Asher, who negotiated the contracts at issue on behalf of the plaintiffs. (Docket Entry No. 14, p. 16, n. 18). Asher testified that CPUC commissioner Donald Vial had advised him that Decisions 9 and 10 governed the EOR market negotiations. (Docket Entry No. 14, App. B). SoCalGas objects to this testimony as hearsay; this court agrees. Plaintiffs also submitted the affidavit of Albert G. Boyce, vice president of Tannehill Electric Company, Inc., a company which has also sued SoCalGas under the antitrust laws. Boyce's affidavit states that Hulett told him that the CPUC did not want transport-or-pay provisions to be used. (Docket Entry No. 39, Exhibit 4, ¶ 4). Boyce's statement is also based on hearsay.

9 states that transport-or-pay provisions are prohibited in default tariff rate contracts, where demand charges will be used, individually negotiated EOR contracts, specifically addressed in Decision 9, had few, but specifically addressed, limits. 22 CPUC 2d at 471; Docket Entry No. 6, Exhibit 4, p. 471. The CPUC's official action, evidenced in the Resolutions, is not an unreasonable interpretation of, or clearly forbidden by, the CPUC's own regulations and decisions.

Plaintiffs also submit an internal SoCalGas memorandum written by its in-house counsel, Joan LeSage, two weeks after the CPUC issued Decisions 9 and 10. The LeSage memorandum states:

> Attached is a revised transportation contract to be filed in conjunction with the revised long-term EOR transportation tariff required by D–86–12–010.... [R]eferences to the take-or-pay have been deleted.

(Docket Entry No. 60, Exhibit 21, p. 1). SoCalGas responds that the LeSage memorandum addressed proposed "general terms and conditions" which would be used for both long-term individually negotiated contracts— in which transport-or-pay provisions were permissible—and for standard tariff rate contracts—in which transport-or-pay provisions were disallowed. (Docket Entry No. 64, p. 9). Because the boilerplate language would be placed in all contracts, the transport-or-pay provisions were necessarily eliminated to conform with the more stringent standards set out for the default tariff contracts.

**■■]** Plaintiffs also note that another regulated utility, PG & E, did not include transport-or-pay provisions in their contracts. Plaintiffs submit the internal memorandum of Dan Douglass, in-house counsel for SoCalGas, which acknowledges this fact. (Docket

Entry No. 60, Exhibit 6). Douglass wrote that:

> [w]hat PG & E has done with these contracts is to establish a long-term agreement structure which strictly adheres to the CPUC's OII/OIR format of charges.... [T]here is no take-or-pay provision. As you are aware, our GLT contract includes a 50% take-or-pay. No take-or-pay appears to put PG & E in the position to potentially lose these customers to an interstate pipeline if one is built.

(*Id.*).[16] The fact that another utility company did not include transport-or-pay clauses in its individually negotiated long-term EOR contracts does not raise a fact issue as to whether SoCalGas's contracts conflicted with CPUC policy.

Plaintiffs also submit a handwritten memorandum from Dan Douglass, stating that:

> [SoCalGas] should send the message that we are flexible on price although we [sic] then require a higher take-or-pay commission.

(Docket Entry No. 39, Exhibit D). This statement is consistent with SoCalGas's position that the take-or-pay provision was a concession noncore customers were required to make in exchange for receiving lower rates than those set by the CPUC's default tariff schedule or standard rate contracts.

This summary judgment evidence does not raise a fact issue as to whether the CPUC had a policy prohibiting the use of transport-or-pay provisions in individually negotiated long-term EOR contracts in 1988.

**■■■]** On September 13, 1996, plaintiffs reurged their Rule 56(f) motion, seeking to depose Dan Douglass and Joan LeSage, in-house counsel for SoCalGas, and "those persons involved in the contract negotiations." (Docket Entry No. 71, p. 11, n. 7). Rule 56(f) provides that:

> Plaintiffs also submit the affidavit testimony of two experts in market regulation of California gas utility companies, who state that Decision 10 applied to the contracts at issue; and that there was no exception for individually negotiated long-term EOR contracts. (Docket Entry No. 60, Exhibits 8 and 9). These affidavits present legal conclusions and do not raise a fact issue.

---

16. Plaintiffs also cite to an advice letter, written by R.M. Rawlings, SoCalGas's vice president of regulatory affairs on August 5, 1988, which plaintiffs assert "recognizes that Decisions 9 and 10 apply to EOR customers." (Docket Entry No. 57, Exhibit 8, p. 2). The letter discusses the provisions of Decision 9, authorizing negotiating flexibility for contracts with noncore EOR customers. (*Id.*). The letter does not mention Decision 10 at all. (*Id.*).

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f). "Rule 56 does not require that any discovery take place before [a motion for] summary judgment can be granted." *Potter v. Delta Air Lines, Inc.*, 98 F.3d 881, 887 (5th Cir.1996) (citing *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir.1990)). A court need not allow further discovery when the movant has failed to show specific evidence that would aid the court in its determination. *See, e.g., Exxon Corp. v. Crosby–Mississippi Resources, Ltd.*, 40 F.3d 1474, 1487 (5th Cir.1995); *Robbins v. Amoco Prod. Co.*, 952 F.2d 901, 907 (5th Cir.1992); *Paul Kadair, Inc. v. Sony Corp. of Am.*, 694 F.2d 1017, 1030 (5th Cir.1983). "The nonmoving party must show how the additional discovery will defeat the summary judgment motion." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir.1994) *(citing International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir.1991)).

█ Plaintiffs assert simply that they "are entitled to discovery on [the statements made by Albert Boyce, Stanley Hulett]." (Docket Entry No. 71, p. 11). Plaintiffs do not explain how additional discovery from Joan LeSage or Dan Douglass or the individuals involved with the contract negotiations will create a disputed issue of fact as to the official policy of the State of California and the CPUC in 1988. The resolution of the pending motion for summary judgment requires an analysis of the official positions of the State of California and the CPUC. Further discovery into recollections of the subjective understandings of CPUC officials or company representatives will not aid this court in its determination. Plaintiffs' motion is denied.

█ Based on the relevant evidence in the summary judgment record, this court finds, as a matter of law, that the State of California and the CPUC had a clearly articulated, affirmatively expressed policy of displacing competition with regulation in the field of utility rate regulation. The use of transport-or-pay provisions was within the field regulated and was a foreseeable consequence of such regulation. Such provisions were not prohibited by the CPUC in individually negotiated, long-term EOR gas transportation contracts. The first prong of the *Midcal* test is satisfied.

## B. The Second Prong: Active Supervision

█ To satisfy the second prong of the *Midcal* test, SoCalGas must show that the CPUC exercised ultimate control over the challenged anticompetitive conduct and that it "actively supervised" the anticompetitive conduct. *Patrick v. Burget*, 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988); *see also Southern Motor Carriers Rate Conference, Inc. v. United States*, 105 S.Ct. at 1723 (applying the state action doctrine on the basis of a finding that state public service commissions have and exercise ultimate authority and control over all intrastate rates); *Parker v. Brown*, 63 S.Ct. at 314 (applying the state action doctrine on the basis that a marketing plan proposed by raisin growers could not take effect unless approved by a state board); *cf. 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n. 7, 107 S.Ct. 720, 726 n. 7, 93 L.Ed.2d 667 (1987) (certain forms of state scrutiny of a restraint established by a private party did not constitute active supervision because the state did not "exer[t] any significant control over" the terms of the restraint). The purpose of the active supervision inquiry is to determine whether "the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 112 S.Ct. at 2177.

In *Patrick v. Burget*, the Supreme Court explained that:

[t]he active supervision requirement stems from the recognition that "[w]here a private party is engaging in the anti-competitive activity, there is a real danger that he

is acting to further his own interest, rather than the governmental interest of the State." The requirement is designed to ensure that the state-action doctrine will shelter only the particular anti-competitive acts of private parties that, in the judgment of the State, actually further state regulatory policies .... The mere presence of some state involvement or monitoring does not suffice .... [S]tate officials [must] have and *exercise* power to review particular anti-competitive acts of private parties and disapprove those that fail to accord with state policy.

108 S.Ct. at 1663 (emphasis added).

In *Ticor*, the Supreme Court held that there was no active supervision by states that used a "negative option" system to approve insurance rate filings. 112 S.Ct. at 2179–80. Under a negative option system, the rating bureau filed rates for title searches and title examinations with the state insurance office. The rates became effective unless the state rejected them within a specified period. *Id.* at 2174. The Supreme Court held that the "mere potential for state supervision is not an adequate substitute for a decision by the State." *Id.* at 2179. The Supreme Court explained that:

the purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

*Id.* at 2177.

In *Ticor*, there was evidence that under the negative option system, the state would merely check the rate filings for mathematical accuracy; that some rate filings were unchecked altogether; and that rates would remain in effect while the state regulators waited on additional filing information, which in one case took seven years. *Id.* at 2179. The Supreme Court determined that these findings established that "whatever the potential for state regulat[ion] ... active state supervision did not occur." *Id.* Because the system provided only a theoretical mechanism for substantive review and the rate filings were subject to only minimal scrutiny by state regulators, the negative option system failed to meet the "active supervision" requirement. *Id.* at 2177.

Plaintiffs assert that the CPUC's approval of the contracts was not the product of active supervision because: (1) the CPUC ceded its power of review and oversight of the contracts at issue; (2) the CPUC merely rubber-stamped proposed resolutions submitted by SoCalGas; and (3) the transport-or-pay provisions contradicted stated CPUC policy. (Docket Entry No. 14, pp. 23–25). SoCalGas responds that: (1) the CPUC did not give up its right continually to review the contracts; (2) the Resolutions establish as a matter of law that the CPUC actively supervised the contracts at issue; and (3) the transport-or-pay provisions were consistent with CPUC's policy.

#### 1. The CPUC's Power to Review

Several courts have held that the CPUC's regulatory powers of supervision satisfy the second prong of the *Midcal* test. *See, e.g., City of Vernon*, 92 F.3d 1191, 1996 WL 138554, at *3; *Nugget Hydroelectric, L.P. v. Pacific Gas & Elec. Co.*, 981 F.2d at 435; *Norcen Energy Resource*, 1994 WL 519461, at *9; *County of Stanislaus*, 1994 WL 706711, at *24; *Transphase Sys.*, 839 F.Supp. at 715–16.

Plaintiffs do not dispute that the CPUC approved the contracts at issue. Instead, plaintiffs assert that the CPUC effectively gave up its power to "actively supervise" the contracts by waiving its rights to modify the contracts under General Order 96–A. (Docket Entry No. 59, pp. 15–16). General Order 96–A provides that contracts with utilities are subject to future modification by the CPUC and requires the following language to be placed in all contracts:

This contract shall at all times be subject to such changes or modification by the Public utilities Commission of the State of California as said Commission may, from time to time direct in the exercise of its jurisdiction.

(Docket Entry No. 60, Exhibit 16). This language was not placed in the SoCalGas contracts. Plaintiffs note that the Division of Ratepayer Advocates ("DRA"), a division of the CPUC, filed a protest to the waiver of this provision, stating that CPUC approval of the contracts would not be immune from antitrust liability "because the Commission will not be actively supervising" the contracts.[17] (Docket Entry No. 60, Exhibit 1, p. 2).

SoCalGas responds that, although this provision was omitted, the CPUC retained its power actively to supervise the contracts. The CPUC waived its right under General Order 96–A to modify the contracts unilaterally without any finding that the modification was necessitated by the public interest. (Docket Entry No. 64, p. 6). The CPUC expressly stated the limited nature of the waiver in Decision 9:

> [w]e are mindful of the EOR producers' stated desire for contractual certainty. To provide assurance that long-term transportation contracts will be respected and will not be altered at will by this commission or its successors, we have waived the provisions of Sections IX and X of our General Order 96–A to the extent that those provisions require that such utility contracts expressly be made subject to future modification by the Commission.

22 CPUC 2d at 483. The CPUC agreed to modify long-term individually negotiated EOR contracts only upon a finding that the modification was necessitated by the "public interest." Id. at 484.

It is clear that the CPUC retained its power to modify the contracts at issue, subject to a finding that a modification was in the public interest. There is no authority for the proposition that a regulatory agency must retain unfettered discretion continually to modify approved contracts in order to satisfy Midcal's active supervision requirement.

### 2. The CPUC Resolutions

The CPUC Resolutions approving the contracts at issue clearly acknowledge the presence of the transport-or-pay provisions. Resolution No. 2821 states as follows:

> 4. Minimum Transportation Obligation: There is no fixed demand charge, however, McKittrick is required to transport, and/or purchase from SoCal[Gas] not less than 50% of its annualized contract quantity. If this quantity is not transported or purchased by McKittrick, McKittrick will pay the transmission costs for his minimum quantity.

(Docket Entry No. 6, Exhibit 7, p. 3). The Resolution concludes that the contract is "in accordance with Decisions 85–12–102, 86–12–009, 86–12–010 and 87–12–039." (Id., p. 7). Resolution No. 2222 makes the same findings as to the Chalk Cliff contract. (Docket Entry No. 6, Exhibit 8).

Plaintiffs contend that the Resolutions are "meaningless" because they were submitted by SoCalGas and rubber-stamped by the CPUC without any actual review. (Docket Entry No. 71, p. 7; Docket Entry No. 59, pp. 2, 7). Plaintiffs assert that "SoCal[Gas] itself drafted some of these resolutions and sent computer disks to the CPUC so they could simply be copied onto the CPUC computer." (Docket Entry No. 59, p. 7). Plaintiffs submit an internal CPUC document, which states: "Sandra & Anne working on Draft Resol[ution] sent from SoCal[Gas]. Appears to have transferred to our system ok. J.P." (Docket Entry No. 60, Exhibit B to Exhibit 3).

Taken in the light most favorable to plaintiffs, this evidence does not raise a fact question as to whether the CPUC conducted a meaningful review of the contracts. There

---

**17.** SoCalGas objects to this summary judgment evidence as irrelevant and inadmissible hearsay. (Docket Entry No. 66, p. 3). The DRA's position with regard to the elimination of unfettered control by the CPUC is relevant to the question of whether the CPUC surrendered its power of active supervision. The DRA's argument is not being presented to evidence the CPUC's opinion on that issue, and is, therefore, not hearsay. SoCalGas's objections are overruled.

were contested hearings. The proposed resolutions were circulated for public notice and comment before they were adopted. CAL. PUB. UTIL. CODE §§ 309.5, 321, 321.5, 454.

Plaintiffs assert that SoCalGas submitted draft Resolutions to the CPUC, in order to establish a state action defense. (Docket Entry No. 59, p. 9). Plaintiffs point to a May 5, 1988 memorandum by Dan Douglass, SoCalGas's in-house counsel, stating:

> [w]e should also consider the fact that our basic defense to any potential lawsuits remains unchanged. Each of these agreements, as well as all future long-term agreements, will be submitted to the CPUC for its approval. This fact should substantially assist us with regard to the state action defense to any potential lawsuits.

(Docket Entry No. 60, Exhibit 14).

 The fact that SoCalGas had an awareness of what the antitrust laws provided, and that SoCalGas submitted draft proposed resolutions to the CPUC, is not evidence that the CPUC failed actively to review the draft proposed resolutions or the contracts they addressed. As explained by Frederick John, the vice-president of regulatory affairs for SoCalGas at the relevant times, SoCalGas believed that approval by the CPUC would protect them from antitrust challenges "provided [the CPUC] did what they were supposed to do under the state action defense." (Docket Entry No. 60, Exhibit 4, p. 113). SoCalGas's awareness of the state action defense to a potential antitrust challenge does not raise a fact issue as to whether the CPUC actively supervised the contracts.

Plaintiffs cite *Cantor* for the proposition that this court may not rely on the CPUC's "mere approval" to establish active supervision. (Docket Entry No. 71, p. 2). In *Cantor*, the Supreme Court stated:

> [t]he Court has already decided that state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity....
>
> In each of these cases the initiation and enforcement of the program under attack involved a mixture of private and public

decision making. In each case, notwithstanding the state participation in the decision, the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision.

> The case before us also discloses a program which is the product of a decision in which both the respondent and the Commission participated. Respondent could not maintain the lamp-exchange program without the approval of the Commission, and now may not abandon it without such approval. Nevertheless, there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's. Indeed, respondent initiated the program years before the regulatory agency was even created. There is nothing unjust in a conclusion that respondent's participation in the decision is sufficiently significant to require that its conduct implementing the decision, like comparable conduct by unregulated businesses, conform to applicable federal law.

96 S.Ct. at 3118–19. *Cantor* was decided before *Midcal*. In *Cantor*, the Supreme Court concluded that even though the state agency approved of the private anticompetitive conduct, the conduct could not be immune from antitrust challenge because there was no state policy favoring the anticompetitive conduct—product-tying—in the first instance. This court has already determined that the State of California had a clearly articulated policy in favor of regulation over competition, and that the use of transport-or-pay provisions was foreseeable and in the field occupied by the regulatory structure. The CPUC had a policy of permitting the use of such provisions in long-term individually negotiated EOR contracts. The question now before this court is whether the State of California, through its designated agency, actively supervised the specific anticompetitive conduct at issue. As explained in *Ticor*, the active supervision inquiry is intended to determine whether "the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate

state intervention, not simply by agreement among private parties." 112 S.Ct. at 2177.

The Resolutions approving the contracts were issued after the required fact-finding process. CAL. PUB. UTIL CODE §§ 310, 311, 322, 323, 455, 728. This process required public proceedings in which ratepayers and the public were represented. *Id.* §§ 309.5, 321, 321.5, 454. Former commissioner Hulett testified in his deposition that the contracts at issue were reviewed first by the Commission Advisory and Compliance Division; then by each of the commissioners' staff advisors; and finally by the CPUC commissioners *en banc.* (Docket Entry No. 57, Exhibit 7, pp. 40–42). Unlike the facts in *Ticor,* plaintiffs have not shown that the CPUC's regulatory process was itself defective. *See Ticor,* 112 S.Ct. at 2179. The courts have found that the CPUC's review process meets the second *Midcal* prong. *See, e.g., City of Vernon,* 92 F.3d 1191, 1996 WL 138554, at *3 ("SoCal[Gas]'s rates to [plaintiff] were the subject of extensive proceedings before the CPUC and this review established active supervision by the state of California"); *Nugget Hydroelectric,* 981 F.2d at 435 (the CPUC decisions reviewing the defendant's anticompetitive contract provisions were sufficient to prove that the state actively supervised the contracts containing those provisions); *Norcen Energy Resource,* 1994 WL 519461, at *9 (the "CPUC's thorough consideration and reconsideration [of the anticompetitive conduct complained of, as evidenced by the CPUC's resolutions] amply demonstrates the state's active role in regulating [defendant's] conduct in this case"); *County of Stanislaus,* 1994 WL 706711, at *27 (the CPUC's reasonableness review of applications satisfies the active supervision requirement); *Transphase Sys.,* 839 F.Supp. at 716 ("a careful review of the CPUC's public opinions clearly establishes that the Commission actively supervises every aspect of [defendant's] actions attacked by [plaintiff's] complaint").

Although plaintiffs assert that they are not asking this court to disregard the CPUC Resolutions because the CPUC has been politically captured by the utilities, plaintiffs, nonetheless, submit testimony from a legislative investigation suggesting that the CPUC was improperly influenced. (Docket Entry No. 59, p. 10). Plaintiffs contend that the legislative investigation raises a fact question as to whether the CPUC routinely abdicated its obligation actively to review the utilities' proposals. This argument is analogous to that rejected by the Supreme Court in *City of Columbia.* The Supreme Court has clearly stated that a court may not entertain such a challenge to an agency's political independence. *City of Columbia,* 111 S.Ct. at 1351. As the Court explained, to accept plaintiffs' argument would make all anticompetitive conduct approved of by a state regulatory agency subject to an antitrust challenge. *Id.* Such a result would "swallow up the *Parker* rule." *Id.*

 This court finds, as a matter of law, that SoCalGas has met the second prong of the *Midcal* test, requiring active supervision of the anticompetitive conduct. The state action doctrine precludes plaintiffs' antitrust challenge to the inclusion of transport-or-pay provisions in the contracts at issue.

## IV. The Filed Rate Doctrine

 The filed rate doctrine bars antitrust suits alleging competitive injury resulting from the payment of a rate filed with a federal regulatory agency. *Keogh v. Chicago & Northwestern Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 576–78, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981). The filed rate doctrine has been held to apply equally to rates filed with state agencies by every court to have considered the question. *See Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 20 (2d Cir.1994) ("the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies"); *Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992) ("this principle, [which is central to the filed rate doctrine] ..., applies with equal force to preclude recovery under RICO whether the rate at issue has been set by a state rate-making authority or a federal one"); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 494 (8th Cir.), *cert. denied,* 504 U.S. 957, 112

S.Ct. 2306, 119 L.Ed.2d 228 (1992) ("the filed rate doctrine applies whether the rate in question is approved by a federal or state agency"). The filed rate doctrine stands for the proposition that because the administrative agency is vested with the authority to determine what rate is "just and reasonable," courts should not adjudicate what a reasonable rate might be in a collateral lawsuit. *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 250, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951); *Wegoland*, 27 F.3d at 19.

 The Fifth Circuit has held that summary dismissal is appropriate under the filed rate doctrine if the agency at issue "must consider the anticompetitive effect of [its] decisions." *McLeran v. El Paso Natural Gas Co.*, 357 F.Supp. 329, 331 (S.D.Tex.1972), *aff'd*, 491 F.2d 1405 (5th Cir.1974). However, the doctrine grants immunity only as to damages claims, not as to claims for injunctive relief. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 420–22, 106 S.Ct. 1922, 1929, 90 L.Ed.2d 413 (1986) (*"Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation. Such a holding is far different from the creation of an antitrust immunity ..."); *see also Florida Mun. Power Agency v. Florida Power & Light Co.*, 839 F.Supp. 1563, 1571–72 (M.D.Fla.1993).

Plaintiffs argue that they are not challenging the "reasonableness" of the rates approved by the CPUC. Instead, their attack is on SoCalGas's refusal to enter into contracts without transport-or-pay provisions. (Docket Entry No. 14, pp. 25–26). Plaintiffs cite *Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785, 820, 821 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984), in which the plaintiff claimed that AT & T used its monopoly in the telephone service market to attempt to monopolize the telephone equipment market. AT & T required customers who purchased equipment from AT & T's competitors to connect that equipment to the telephone system using an interface device sold only by

AT & T. *Id.* at 789. The Second Circuit held that the filed rate doctrine did not preclude plaintiff's complaint because it did not assert that the interface tariff rate was unreasonable, but rather challenged "whether the [interface] requirement itself was reasonable, *i.e.*, whether there should have been any charge at all." Id. at 820. The issue was the fact of the charge, not merely the resulting amount; the filed rate doctrine did not apply.

SoCalGas contends that Litton is distinguishable because the transport-or-pay provisions at issue were an element of the rate, and because in *Litton* the rate had been filed, but not approved, by the regulatory agency. (Docket Entry No. 24, p. 13). SoCalGas points out that in its approval of plaintiffs' contracts, the CPUC classified the "transport-or-pay" provisions under the "rates and charges" heading. (*Id.*, citing Docket Entry No. 6, Tab 7, pp. 2–3). SoCalGas argues that the "obligation to pay for transportation, even when no transportation is used, is the price." (Docket Entry No. 44, p. 7) (emphasis in original). SoCalGas also notes that the "transport-or-pay" provisions were included instead of demand charges and lowered the overall rate charged for the natural gas.

In Litton, charges for the interface device at issue were included in customers' telephone bills. 700 F.2d at 789. The cost of the interface device clearly affected the total rate paid by telephone customers who chose not to use AT & T equipment. This fact did not preclude a challenge to the requirement that the customer use the AT & T interface device as a condition of obtaining service.

SoCalGas cites *Wegoland, Ltd. v. NYNEX Corp.*, 806 F.Supp. 1112, 1115 (S.D.N.Y.1992), *aff'd*, 27 F.3d 17 (2d Cir.1994), in support of its position. In *Wegoland*, ratepayers brought suit against the regulated telephone companies, asserting that the companies had obtained approval of its rates through fraud on the regulatory agency. *Id.* at 1113. The court explained the premise of the filed rate doctrine, as follows:

> [the filed rate cases] show that two companion principles lie at the core of the filed rate doctrine: first, that legislative bodies design agencies for the specific purpose of setting uniform rates, and second, that

courts are not institutionally well suited to engage in retroactive rate-setting. [the cases] emphasize different aspects of the rationale of the *Keogh* case. While the [one case] focuses on the need to avoid discrimination among rate-payers, [the other case] concentrates on the need for courts to refrain from adjudicating cases that would require them to apply the non-justiciable standard of "the reasonable rate."

*Id.* at 1115. The court concluded that it could not create a "fraud" exception to the filed rate doctrine without undermining the "principal rationale of the filed rate doctrine: the preservation of agency authority." *Id.* at 1118.

*Wegoland* does not apply to this case. Plaintiffs are not attempting to have this court declare that the rates approved by the CPUC were fraudulently obtained or that the rates were too high. Plaintiffs' challenge the inclusion of transport-or-pay provisions, which preclude them from purchasing from competing suppliers.

The Fifth Circuit's opinion in *Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465 (5th Cir.1987), clarifies the distinction between challenges to a rate and challenges to conduct which may affect the overall rate. In *Gulf States*, the plaintiff, an interstate utility company, sued its supplier of electricity, another interstate utility company, alleging various anticompetitive practices. *Id.* at 1468. The Fifth Circuit held that the plaintiff's claim of bad faith negotiations was preempted by the filed rate doctrine because the claim rested on a theory that plaintiff would have paid different rates if the defendant utility company had negotiated in good faith. *Id.* at 1471. In contrast, plaintiff's claim that the defendant should have allowed for changes in capacity was not preempted. *Id.* The Fifth Circuit reasoned that:

> [plaintiff] might be able to show that good faith negotiations would have reduced the amount purchased (not the rate) under the UPS and Interchange contracts and that [plaintiff] was harmed by taking the quantity required in the filed contracts, perhaps by overloading [plaintiff's] capacity.

*Id.* The court noted that setting aside the contracts on this basis would not interfere with the federal regulatory scheme. *Id.* at 1470 n. 4, 1472.

■ In this case, as in *Litton*, plaintiffs are challenging the fact of the transport-or-pay requirement itself, not merely the amount that results from its inclusion. As in Litton, plaintiffs are alleging that the requirement was an invalid use of the defendant's monopolistic power and that the transport-or-pay provisions should not have been included at all. As in *Litton*, the filed rate doctrine does not apply to preclude a challenge under antitrust law.

The recent Ninth Circuit opinion of *Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, supports this conclusion. In *Columbia Steel*, two competing electric companies agreed to divide their service region into two exclusive service territories. 103 F.3d at 1453. A customer located in one of the exclusive service territories challenged the practice, because it resulted in a higher rate for electrical service. *Id.* The Ninth Circuit held that the customer's challenge was not precluded by the filed rate doctrine. *Id.* The customer challenged the agreement that prevented him from buying from another supplier. The fact that this resulted in a higher rate did not immunize the agreement from an antitrust challenge. *Id.* at 1458–59.

SoCalGas's inclusion of transport-or-pay provisions is not immune from antitrust attack under the filed rate doctrine.

## V. The Option Agreements

Plaintiffs claim that SoCalGas's option agreements with Kern River and Mojave Pipeline to purchase the California portions of the interstate pipelines violate the Sherman Act. SoCalGas asserts that plaintiffs lack standing because they have not suffered any antitrust injury; the claim is not ripe; and the state action doctrine precludes the antitrust challenge. (Docket Entry No. 4, pp. 16–17, 20).

### A. Background

In 1985, when Kern River and Mojave Pipeline sought FERC certification to con-

struct interstate gas transmission pipelines to Kern County, California, SoCalGas, and CPUC opposed certification. The CPUC explained its position on the certification application by the proposed interstate pipeline owners, as follows:

> [we] oppose those bypass pipelines and object to FERC preemption of valid state regulation of local distribution associated with such projects. We continue to believe that unrestricted entry of interstate pipelines into California for the purpose of "cream skimming" major industrial customers does significant harm to remaining captive customers.

*In re Interstate Natural Gas Pipeline Supply and Capacity*, 35 CPUC 2d 196, 250, Dec. 90–02–016 (Cal.P.U.C. Feb. 7, 1990). Because increased pipeline capacity in Kern County could attract SoCalGas's existing EOR customers to interstate carriers, the CPUC feared that the increased capacity would result in higher prices for the utilities' remaining customers. Ellig, 7 J. REGULATORY ECON. at 302. The CPUC expressed its belief that the new interstate pipelines were motivated in part by a desire "to accommodate the expressed preference of some oil companies to avoid [CPUC] ... regulation." *Id.*

The settlement agreements between Kern River and SoCalGas and Mojave Pipeline and SoCalGas provided SoCalGas options to purchase the California portions of the Texas-based pipelines after twenty years of operations. *See* D. 90–10–034, 38 CPUC 2d at 11. In approving the settlement agreements, the CPUC stated that Kern River's and Mojave Pipeline's grant of the options to SoCalGas was a concession to the CPUC's jurisdiction consistent with the CPUC's stated policy of maintaining state regulation. *Id.* at 9–10. The CPUC concluded that the options grant was "a valid resolution to the jurisdictional concerns we have consistently pursued." *Id.* at 10.

### B. Standing and Ripeness: Antitrust Injury

SoCalGas contends that plaintiffs lack standing to assert their "options claim" because any injury that may result from the exercise of the options in the future is too abstract and speculative. (Docket Entry No. 4; pp. 22–23). Plaintiffs contend that they are not claiming injury as a result of the potential future exercise of the options, but rather have suffered and will suffer damages as a result of SoCalGas's illegal attempt to maintain its monopoly power, which resulted in plaintiffs' inability to obtain long-term gas contracts without transport-or-pay provisions. (Docket Entry No. 14, p. 37).

A plaintiff must prove that "it has or will suffer antitrust injury." *Anago, Inc. v. Tecnol Med. Prods., Inc.*, 976 F.2d 248, 249 (5th Cir.1992), *cert. dismissed*, 510 U.S. 985, 114 S.Ct. 491, 126 L.Ed.2d 441 (1993). The Supreme Court has defined antitrust injury as an injury " 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Id.* (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986)).

Plaintiffs fail to plead or raise a fact issue that their inability to negotiate long-term transportation contracts without transport-or-pay provisions was linked to or affected by whether SoCalGas owned options to purchase the California portions of the interstate pipelines in the year 2012. There is no injury in SoCalGas's ownership of the options sufficient to confer standing.

Even if plaintiffs could assert an antitrust injury flowing from SoCalGas's options ownership, the challenge to the options is not ripe for adjudication. A federal court may not take jurisdiction over a matter unless it presents an actual controversy. *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272–74, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). Courts have held that challenges to an option are not ripe for resolution before the option is exercised. *See Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir.1986); *Mullins v. Benton*, 309 S.C. 85, 419 S.E.2d 838, 840 (1992); *Blue Cross of R.I. v. Cannon*, 589 F.Supp. 1483, 1493 (D.R.I.1984).

In *Middle South Energy*, 800 F.2d at 490, the City of New Orleans owned an option to purchase electrical facilities from the New

**462**

Orleans Public Service, Inc. ("NOPSI"), a subsidiary of Middle South Utilities. Middle South Energy, Inc., another subsidiary of Middle South Utilities, along with NOPSI, sued for declaratory and injunctive relief against the City's ability to exercise its option. The Fifth Circuit held that the matter was not ripe, explaining that:

> When and how the Council exercises its option, if it ever does, are the critical determinants of the propriety of federal court jurisdiction over this matter. Until the City Council actually votes to exercise the purchase option, we must be careful to "avoid imposition under [our] jurisdiction through obtaining futile or premature interventions, especially in the field of public law."

*Id.* at 491 (citing *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242–44, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952)).

Plaintiffs contend that *Middle South Energy* does not apply because plaintiffs do not challenge SoCalGas's exercise of its option, but rather SoCalGas's acquisition of the option. (Docket Entry No. 14, p. 37). Plaintiffs have not stated any injury resulting from acquisition of the option or any authority to support this position. This argument does not make SoCalGas's possession of the options ripe for challenge. This court cannot properly undertake a premature intervention, "especially in the field of public law." *Middle South Energy*, 800 F.2d at 491.

### C. State Action Doctrine

■ The state action doctrine also precludes the assertion of plaintiffs' antitrust challenge to SoCalGas's acquisition or possession of the options. Both prongs of the *Midcal* test are satisfied by the summary judgment evidence. California and the CPUC had a clearly stated and affirmatively expressed policy of serving the Kern County, California EOR market through the California utilities. The CPUC reviewed and approved settlement agreements in which SoCalGas acquired the options, expressly finding that Kern River's and Mojave Pipeline's grant of the options to SoCalGas was a concession to the CPUC's jurisdiction and consistent with the CPUC's stated policy.

*See* CPUC Dec. 90–10–034, 38 CPUC 2d at 9–10. There are no disputed fact issues material to the CPUC's approval of those settlement agreements, resulting from its active supervision.

This court GRANTS SoCalGas's motion for summary judgment on plaintiffs' claims regarding the option agreements.

### VI. The *Noerr–Pennington* Doctrine

Plaintiffs allege that SoCalGas improperly objected "to the FERC certification of new competitive interstate pipelines through a series of frivolous and baseless judicial challenges to such pipelines in order to exclude actual or potential competitors from the market." (Docket Entry No. 1, ¶ 25(a)). SoCalGas contends that its opposition to the certification of Kern River and Mojave Pipelines is protected from antitrust challenge under the *Noerr–Pennington* doctrine. (Docket Entry No. 4, p. 17).

■ The *Noerr–Pennington* doctrine grants antitrust immunity to political activity designed to influence government action, even when the activity advocates "policies to federal, state and local government bodies that may destroy competitors." *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135–37, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961); *Barton's Disposal Serv. v. Tiger Corp.*, 886 F.2d 1430, 1436 (5th Cir.1989). However, the *Noerr–Pennington* doctrine does not protect political activity which is "a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." *Id.*

■ The Supreme Court has established a two-prong test for determining whether a defendant's actions fall within the sham exception. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–58, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993). First, the challenge must be objectively baseless. *Id.* at 1928. A suit is not objectively baseless if a reasonable litigant could have realistically expected a favorable outcome of the suit on the merits. *Id.* Second, if the challenge is found to be objectively baseless, the court must deter-

mine the actor's subjective intent. *Id.* A challenge will be found a sham only if the actor sought to use the governmental process itself, rather than the results of that process, to interfere directly with a competitor's business. *Id.*

In *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 508–10, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), the plaintiff trucking companies argued that the defendant competitors conspired to block their attempts to acquire operating rights to enter the California trucking business, or to transfer or register those rights, by challenging plaintiffs' regulatory applications. Specifically, the plaintiffs alleged that the defendants' resources were "used to harass and deter [the plaintiffs] in their use of administrative and judicial proceedings ... [such that] the machinery of the agencies and the courts was effectively closed to [them]." *Id.* at 612. The Supreme Court held that such activities, if proven, came under the sham exception to the *Noerr–Pennington* doctrine and upheld the circuit court's reversal of the trial court's dismissal for failure to state a cause of action. *Id.* at 614.

In *Norcen Energy Resource Ltd. v. Pacific Gas & Elec. Co.,* 1994 WL 519461, *1 (N.D.Cal. Sept.19, 1994), the plaintiff claimed that a California electricity and gas utility had used the regulatory processes of the FERC and the CPUC to eliminate alternative sources of natural gas within its service area. The court dismissed the claim, holding that a utility's petitions to the FERC and CPUC, which were intended to impede regulatory approval of potential competitors, were immune from antitrust attack under the *Noerr–Pennington* doctrine. *Id.* at *6. The court held that *Noerr* barred "antitrust claims to the extent they are based on defendants' actions before either CPUC or FERC." *Id.*

Plaintiffs argue that discovery would establish that SoCalGas's actions before the FERC were intended to stall the entry of competition into the Kern County market until after SoCalGas had locked up the signif-

icant EOR/cogeneration customers with long-term contracts containing transport-or-pay provisions. (Docket Entry No. 14, p. 36). In their supplemental brief to SoCalGas's motion to dismiss, plaintiffs argue that SoCalGas represented to the FERC that the "interstate pipelines were unnecessary because there was plenty of capacity on SoCal[Gas]'s lines to handles the EOR market." (Docket Entry No. 59, p. 6, n. 6). Plaintiffs contend that SoCalGas knowingly overstated its ability to serve the market. (*Id.*). Plaintiffs submit testimony by two experts that a comparison of the California Gas Reports for 1986 and 1990 show that SoCalGas overstated its ability to handle the EOR market and that SoCalGas had to curtail deliveries to various customers only nine months after its representation to the FERC.[18] (Docket Entry No. 60, Exhibits 8, ¶ 12, and 9, ¶ 13).

In order to plead a sham exception, "a complaint must include allegations of the specific activities not protected by *Noerr,* which plaintiffs contend have barred their access to a governmental body." *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers,* 542 F.2d 1076, 1080, 1081 (9th Cir.1976), cited in *Transphase Systems,* 839 F.Supp. at 717. Plaintiffs' complaint alleges that SoCalGas opposed the certification process for the sole purpose of delaying entry by competing companies to gain monopolistic control of the market. Plaintiffs' complaint does not allege any such facts. The complaint does not identify any position taken before the FERC that would establish that SoCalGas's opposition was objectively baseless.

Even if the allegations were properly presented in plaintiffs' complaint, the present summary judgment record contains no evidence to raise a fact issue as to whether SoCalGas's objections to the FERC certification application were both objectively and subjectively baseless. Plaintiffs argue that SoCalGas misrepresented its capacity to service the EOR market in Kern County, California. The CPUC took the position in its

---

18. SoCalGas objects to this testimony as unsupported. The affidavits clearly state that this opinion is based on a comparison of the Califor- nia Gas Reports. SoCalGas's objection is overruled.

Decisions, and before the FERC, that the California utilities had sufficient capacity to serve the potential EOR market in Kern County. *See* Decision 86–012–009, 22 CPUC 2d at 482, Docket Entry No. 6, Exhibit 4, p. 482 ("[w]hat we can say today with confidence is that the California utilities currently have considerable excess capacity which is projected to decline gradually but should persist well into the 1990's"); Decision 85–12–102, 20 CPUC 2d at 21; Docket Entry No. 6, Exhibit 5, p. 21 ("the anticipated EOR market in Kern County can be served using the existing facilities of SoCal and PG & E"). The CPUC itself opposed FERC certification of the proposed interstate pipelines. The evidence does not raise a fact issue as to whether SoCalGas objectively and/or subjectively knew that its opposition to the certification applications was baseless and presented for the sole purpose of harming potential competitors.

Based on the summary judgment record, this court GRANTS the motion for summary judgment with regard to plaintiffs' claim that SoCalGas's opposition to the FERC certification applications of Kern River and Mojave Pipeline violated the Sherman Antitrust Act.

## VII. The Texas Antitrust Laws

SoCalGas contends that Texas antitrust laws do not apply to plaintiffs' claims because the conduct complained of occurred in California, not Texas. (Docket Entry No. 4, p. 24). The Texas Free Enterprise and Antitrust Act ("TFEAA"), enacted in 1983, provides in pertinent part that:

[t]he purpose of this Act is to maintain and promote economic competition in trade and *commerce occurring wholly or partly within the State of Texas* and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to accomplish this purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose....

[n]o suit under this Act shall be barred on the grounds that the *activity or conduct complained of in any way affects or involves interstate or foreign commerce.* It

is the intent of the legislature to exercise its powers to the full extent consistent with the constitutions of the State of Texas and the United States.

TEX. COM. & BUS. CODE §§ 15.04, 15.25(b). Plaintiffs contend that the TFEAA applies because there is a Texas component to the SoCalGas transactions. (Docket Entry No. 14, p. 40).

The TFEAA states that it applies to commerce occurring in whole or in part in Texas. TEX. COM. & BUS. CODE § 15.04. Section 15.25(b) of the TFEAA does not provide that any conduct that has some effect on a Texas entity is subject to Texas antitrust laws. Rather, section 15.25(b) states that conduct is not to escape application of the TFEAA merely because it occurs in Texas and also affects or involves interstate commerce. The conduct complained of in this case occurred in California. SoCalGas has taken no action affecting the ability of Texas consumers to obtain the benefits of competition. The application plaintiffs seek is inconsistent with the stated purpose of the TFEAA.

This court GRANTS SoCalGas's summary judgment motion dismissing plaintiffs' claims under the TFEAA.

## VIII. Conclusion

This court GRANTS SoCalGas's motion for summary judgment. This court ORDERS SoCalGas to submit a proposed final judgment within fifteen days from the date this Memorandum and Order is entered.

### MEMORANDUM AND OPINION ON MOTION FOR RECONSIDERATION

Plaintiffs move for reconsideration of this court's June 7, 1997 Memorandum and Opinion, and object to an entry of judgment, on two grounds. The first ground is federal preemption. Plaintiffs argue that the effect of this court's conclusions on the state action doctrine is to allow the California Public Utility Commission ("CPUC") indirectly to regulate interstate pipelines, which are within the jurisdiction of the Federal Energy Regulatory Commission ("FERC"). (Docket

Entry No. 85). Plaintiffs' second argument is that a recently discovered 1987 Decision of the CPUC, in which the CPUC reminded Southern California Gas Company ("SoCal-Gas") that its shareholders, rather than California ratepayers, would be responsible for any penalties assessed as a result of successful antitrust actions, calls this court's finding of state action immunity into question.

SoCalGas has responded to both arguments. (Docket Entry Nos. 86, 88). Plaintiffs have replied. (Docket Entry No. 87).

On the basis of the motion for reconsideration, the parties' submissions, and the applicable law, this court DENIES the motion for reconsideration and the objection to the entry of judgment, for the reasons set out below.

## I. Federal Preemption

Plaintiffs do not argue that the CPUC lacks jurisdiction over SoCalGas and its contracts, or that SoCalGas is within FERC's exclusive jurisdiction. The parties agree that under the Hinshaw Amendment to the Natural Gas Act, 15 U.S.C. § 717(c), the CPUC, not FERC, has jurisdiction over So-CalGas and the contracts at issue. Rather, plaintiffs argue that to interpret the CPUC's exercise of its jurisdiction as endorsing transport-or-pay provisions in long-term gas transportation contracts conflicts with FERC's policy of encouraging competition in the California natural gas transportation market, and is therefore preempted under the Supremacy Clause of the United States Constitution. Plaintiffs assert that this court erred in "interpret[ing] CPUC Decision 86–12–009 as creating an affirmatively expressed policy authorizing the use of transport-or-pay provision in long-term Enhanced Oil Recovery ("EOR") gas transportation contracts," because "the [c]ourt's interpretation places California policy ... in direct conflict with FERC's policy to open competition in the California gas transportation market ...." (Docket Entry No. 85, p. 2).

This argument is limited to the court's application of the first of the two prongs of the *Midcal* test for state action immunity, that "the challenged restraint must be 'one clearly articulated and affirmatively ex-pressed as state policy.'" *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980). In the Memorandum and Opinion, this court held that the State of California had an affirmatively expressed policy of regulating the California natural gas market, and that the use of transport-or-pay provisions was a foreseeable consequence of that authorized regulation. (Docket Entry No. 84, p. 43).

The first prong of the *Midcal* test for state action immunity does not require a "specific, detailed legislative authorization" for the challenged conduct or restraint. Rather, if the state clearly intends to create a regulatory program, it need not spell out all the details of how the program should or will operate, as long as there is a clear intent by the state legislature to delegate the determination of the details to the agency. *See id.; Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 63–66, 105 S.Ct. 1721, 1730–31, 85 L.Ed.2d 36 (1985). If private companies then propose rates, tariffs, or contract terms over which the state regulatory commission has authority, the inquiry becomes whether the proposal is a foreseeable consequence of the decision to displace competition with regulation and whether the commission's review process meets the "active supervision requirement," the second prong of the *Midcal* test. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 370–74, 111 S.Ct. 1344, 1349–50, 113 L.Ed.2d 382 (1991); *Southern Motor Carriers*, 105 S.Ct. at 1730; *Martin v. Memorial Hosp. at Gulfport*, 86 F.3d 1391, 1398–99 (5th Cir.1996); *DFW Metro Line Servs. v. Southwestern Bell Tel., Corp.*, 988 F.2d 601, 605 (5th Cir.1993). The state action doctrine does not also require a finding that the state had an "affirmatively expressed and clearly articulated" policy specifically endorsing the use of transport-or-pay provisions. The first response to plaintiffs' motion for reconsideration is that, to the extent it rests on the argument that this court must find that the State of California affirmatively expressed a policy endorsing transport-or-pay provisions, such a finding

was not necessary to the court's grant of defendants' summary judgment motion.

Plaintiffs also argue that merely by approving contracts that contain transport-or-pay provisions, the State of California, through the CPUC, exercised its jurisdiction in a manner that conflicted with, and is therefore preempted by, federal policy to promote competition in the California natural gas market. Although the Natural Gas Act gives FERC jurisdiction over sales for resale in interstate commerce and over the interstate transportation of gas, the regulation of local distributors is left to the states. The Hinshaw Amendment excludes from FERC's jurisdiction gas that is received within a state (or at the state boundary) and is consumed within that state, provided that the gas is subject to state regulation. The Amendment provides that:

> The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

15 U.S.C. § 717(c).

As noted above, the parties agree that SoCalGas is subject to the Hinshaw Amendment; that the CPUC had exclusive jurisdiction over the contracts at issue; and that FERC does not have jurisdiction to regulate an intrastate utility's rates. (Docket Entry No. 87, p. 2). *See Altamont Gas Transmission Co. v. FERC,* 92 F.3d 1239, 1248 (D.C.Cir.1996), *cert. denied sub nom., Indicated Expansion Shippers v. FERC,* —— U.S. ——, 117 S.Ct. 1568, 137 L.Ed.2d 714 (1997). However, plaintiffs assert that preemption nonetheless applies because the CPUC approved contracts that conflict with FERC's policy to open competition in the California natural gas market. Plaintiffs contend that by allowing the use of transport-or-pay provisions, the CPUC effectively "locked in" a large portion of the natural gas market and

hampered the ability of interstate gas utilities to enter the California market. (Docket Entry No. 85, pp. 2, 5).

■ Courts have refused to allow FERC to consider the anticompetitive effects of transactions approved by a state regulatory body when those transactions were within that state's exclusive jurisdiction. "[W]hen the Congress explicitly reserves jurisdiction over a matter to the states, ... the Commission has no business considering how to 'induc[e] a change [of state] policy' with respect to that matter." *Altamont Gas,* 92 F.3d at 1248. As the Supreme Court has stated:

> "The [Natural Gas Act] 'was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other.' "

*Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 511–13, 109 S.Ct. 1262, 1275, 103 L.Ed.2d 509 (1989) (quoting *FPC v. Panhandle Eastern Pipe Line Co.,* 337 U.S. 498, 512–14, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949)), quoted *in Altamont Gas,* 92 F.3d at 1248.

In *Altamont Gas,* FERC lowered the rate of return that would be earned by a Hinshaw pipeline to eliminate higher charges on interstate shippers competing for sales in the California market. FERC did so by conditioning a certificate of public convenience and necessity for an interstate pipeline on the pipeline's intrastate affiliate changing its rate structure. The CPUC contended that the Hinshaw Amendment put the intrastate rates outside FERC's legitimate area of concern; those rates were approved or required by the CPUC, and were within its jurisdiction. The court held that when the alleged anticompetitive pricing was traceable to a state agency's regulation of a Hinshaw pipeline, outside FERC's federal jurisdiction and reserved to state regulation, federal authority could not intercede. *Id.* at 1247–48.

In this case, plaintiffs argue preemption based on the anticompetitive effects of the transport-or-pay provisions in contracts approved by the state agency in the exercise of its exclusive jurisdiction, that are inconsis-

tent with FERC policy. (Docket Entry No. 87, p. 3, n. 1). That argument would permit a private party to enforce a FERC policy when FERC would itself be unable to do so. Federal preemption cannot occur where, as here, the regulation has been explicitly reserved by Congress to the state. *Altamont Gas,* 92 F.3d at 1248.

The cases cited by plaintiffs do not support the extension of federal preemption that they propose. In *Public Utils. Comm'n of the State of Cal. v. FERC,* 900 F.2d 269 (D.C.Cir. 1990) (*"Wycal"*), the CPUC attempted to assert jurisdiction over the California portion of a proposed interstate pipeline. *Id.* at 273. The CPUC argued that it should have jurisdiction over the " 'taps, meters and other tie-in facilities' that link the pipeline to the end users." *Id.* The court found that "[t]his jurisdiction would give California a toehold to bring Wycal within its regulatory reach, and might help it to mitigate the effects of, or even completely prevent, Wycal's bypass of local distribution companies." *Id.* at 274 n. 1. The court concluded that where FERC had jurisdiction under the National Gas Act, that jurisdiction preempted state regulation. *Id.* at 274. Plaintiffs also cite *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963), in which the Supreme Court struck down orders of the Kansas State Corporation Commission requiring an interstate pipeline to purchase natural gas ratably from all gas wells connected with the pipeline system in the state. *Id.* at 650. The Court stated:

> The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas ... or for state regulations which would indirectly achieve the same result. These state orders necessarily deal with

matters which directly affect the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation which was an objective of the Natural Gas Act. They therefore invalidly invade the federal agency's exclusive domain.

*Id.* at 650–51. In this case, by contrast, the CPUC is not regulating the California portion of an interstate utility, but is regulating a Hinshaw pipeline within the state's exclusive jurisdiction. These cases do not require a reversal of this court's summary judgment grant.

In *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 309–11, 108 S.Ct. 1145, 1156, 99 L.Ed.2d 316 (1988), the Supreme Court struck down a Michigan law regulating the sale of investment securities in Michigan by interstate natural gas pipelines on the ground that Michigan's securities law would or could interfere with FERC's exclusive jurisdiction to regulate those interstate pipelines. In reaching its decision, the Court stated that regulation of interstate gas transactions is "a field the [Natural Gas Act] has occupied to the exclusion of state law." *Id.* at 1151. Plaintiffs contend that *Schneidewind* establishes that state regulation is preempted whenever it interferes with FERC policy. (Docket Entry No. 87, p. 3, n. 1). In *Schneidewind,* the Court held that state securities laws could not be applied to an *inter* state natural gas pipeline within FERC's exclusive jurisdiction. *Schneidewind,* 108 S.Ct. at 1156. In *Schneidewind,* as in *Wycal* and *Northern Natural Gas,* federal regulations preempted state regulation of an *inter* state, not *intra* state, natural gas pipeline.[1]

---

1. Plaintiffs' argument appears similar to the preemption argument rejected by the Supreme Court in *Northwest Central Pipeline.* In *Northwest Central Pipeline,* the Kansas Corporation Commission adopted a regulation to "encourage timely production of gas quotas by providing that the right to extract assigned amounts of gas will permanently be lost if production is too long delayed." *Northwest Central Pipeline,* 109 S.Ct. at 1267. Kansas relied on 15 U.S.C. § 717(b), which excludes in part from FERC jurisdiction "the production or gathering of natural gas." The Supreme Court had earlier construed section 717(b) as exclusively reserving regulation of production and gathering activities to the states. *Northwest Central Pipeline,* 109 S.Ct. at 1274 (citing *Northern Natural Gas,* 83 S.Ct. at 650). An interstate pipeline challenged the Kansas regulations as preempted by federal law. The pipeline did not deny that section 717(b) reserved jurisdiction over the production and gathering of natural gas to the states, but argued that "though directed to producers, [the regulation] impermissibly *affects* interstate pipelines' purchasing mix and hence price structures, and requires the abandonment of gas dedicated to interstate com-

Plaintiffs' position is not required by, nor consistent with, the complicated state and federal relationships that are involved in the Natural Gas Act, including the Hinshaw Amendment, and in the state action antitrust doctrine itself. The Hinshaw Amendment limited federal jurisdiction by excluding from federal regulation certain intrastate pipelines that are subject to state commission regulation. The state action doctrine is itself a limitation on federal preemption. The federal preemption doctrine generally resolves conflicts between state and federal law in favor of federal law, under the authority of the Supremacy Clause of the United States Constitution. When the requirements of the state action doctrine are met, its application resolves the tension between federal antitrust regulations and a state's sometimes anticompetitive regulation of business activities, in favor of the state.

█ The Hinshaw Amendment applies here to reserve to the State of California the authority to regulate the SoCalGas pipeline at issue. Intrastate regulation that seeks to secure the intrastate market for intrastate utilities may by definition have a negative effect on interstate utilities' efforts to enter the market and may be inconsistent with FERC's goal of increasing competition in the natural gas market.[2] To accept plaintiffs' argument that the CPUC's approval of two long-term EOR contracts with transport-or-pay provisions is preempted by federal law because the contracts have a negative effect on the ability of interstate utilities to enter the California market is essentially to eliminate the state action doctrine. Plaintiffs' argument does not provide a basis for reconsideration.

## II. The "Newly Discovered" CPUC Decision

In their July 23, 1997 letter to the court, plaintiffs for the first time cite to a 1987 CPUC decision, which plaintiffs contend "expressly *modifies and amends* Decisions 86–12–009 and 86–12–010 with respect to the core issue of whether SoCal's contracts under the 'program' laid out in those decisions are immune from attack under the antitrust laws because of the *Parker* doctrine." (Plaintiff's Letter Brief of July 23, 1997, pp. 1–2) (emphasis in original). In *Order Instituting Investigation on the Commission's Motion into Implementing a Rate Design for Unbundled Gas Utility Services Consistent with Policies Adopted in Decision 86–03–057; Order Instituting an Investigation by Rulemaking into Proposed Refinements for New Regulatory Framework for Gas Utili-

merce, both matters within FERC's jurisdiction under the NGA." *Id.* at 1272 (emphasis added). The Supreme Court rejected the pipeline's argument. The Court noted that to accept the argument that the effect of a state regulation promulgated under a grant of exclusive state jurisdiction on interstate commerce could encroach on FERC jurisdiction "would be to engage in ... an extravagant interpretation of the scope of federal power." *Id.* at 1275. The Court held:

> To find field pre-emption of Kansas' regulation merely because purchasers' costs and hence rates might be affected would be largely to nullify that part of NGA § 1(b) that leaves to the States control over production, for there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations. Congress has drawn a brighter line, and one considerably more favorable to the States' retention of their traditional powers to regulate rates of production, conserve resources, and protect correlative rights.

*Id.* at 1276.

The Court has recognized that both section 717(b) and the Hinshaw Amendment reserve exclusive jurisdiction over certain natural gas activities to the states. *General Motors Corp. v. Tracy*, 519 U.S. 278, 117 S.Ct. 811, 817 n. 3, 136 L.Ed.2d 761 (1997). *Northwest Central Pipeline* supports SoCalGas' argument that the fact that the CPUC's approval of transport-or-pay provisions in long-term gas transportation contracts under the Hinshaw Amendment may "affect" interstate pipelines does not alone justify preemption.

**2.** As the *Northwest Central Pipeline* Court stated with respect to section 717(b) of the Natural Gas Act:

> [i]n the integrated gas supply system, these jurisdictional tensions will frequently appear in the form of state regulation of producers and their production rates that has some effect on the practices or costs of interstate pipelines subject to federal regulation. Were each such effect treated as triggering conflict preemption, this would thoroughly undermine precisely the division of the regulatory field that Congress went to so much trouble to establish in § 1(b), and would render Congress' specific grant of power to the States to regulate production virtually meaningless.

*Northwest Central Pipeline*, 109 S.Ct. at 1276–77.

*ties,* 1987 Cal. PUC LEXIS 553 (Mar. 17, 1987)(the "1987 Decision"), the CPUC stated:

> [W]e stress that the utilities are at risk for any costs or damages assessed them as a result of successful antitrust actions relating to any of their contracts under this program. The shareholders, and not the ratepayers, will be held responsible for such penalties.

*Id.* at *25–26.

█ The 1987 Decision merely "puts the utilities on notice" that if they violate CPUC policies and, as a consequence, are declared liable for an antitrust violation, the damages will be borne by the shareholders, not the ratepayers. This Decision is not inconsistent with this court's interpretation of the prior CPUC orders.

### III. Plaintiffs' Objection to an Entry of Judgment

After plaintiffs filed their motion for reconsideration, two of the plaintiffs, Chalk Cliff Limited and McKittrick Limited, jointly filed in this court a voluntary petition for relief and automatic stay under the Bankruptcy Code. (Docket Entry No. 90). This court requested that the parties brief the question of how the bankruptcy filing affected this court's ability to rule on the motion for reconsideration as to all parties and to enter judgment. The parties responded to this court's request. (Docket Entry Nos. 92, 93). In their responses, plaintiffs and SoCalGas agree that the automatic stay does not preclude this court from entering judgment as to all plaintiffs, because a stay under 11 U.S.C. § 362(a) applies only to proceedings against a debtor. *See, e.g., McMillan v. MBank Fort Worth, N.A.,* 4 F.3d 362, 366 (5th Cir. 1993). The parties' agree that this court may enter judgment as to all the parties. This court finds that section 362(a) does not preclude the entry of final judgment.

### IV. Conclusion

This court DENIES the motion for reconsideration and overrules the objection to the entry of judgment.